**GENERAL THEATRES, Inc., v. METRO-GOLDWYN–MAYER DISTRIBUTING CORPORATION et al.**

No. 10452.

District Court, D. Colorado.

Jan. 14, 1935.

Ewing & Arnold, of Denver, Colo., for complainants.

Byron G. Rogers, Asst. U. S. Atty., of Las Animas, Colo., for defendant Denver Grievance Board of the Code Authority of the Motion Picture Industry of the National Recovery Administration.

Eugene I. Reed, of Denver, Colo., for Denham Theatre, Inc.

Thomas Keely, of Denver, Colo., for Metro-Goldwyn-Mayer Distributing Corporation, Fox Film Corporation, United Artists Corporation, Universal Film Exhange, Inc., and Vitagraph, Inc.

SYMES, District Judge.

The plaintiffs are engaged in the business of moving picture exhibitors, and operate six or seven of the largest moving picture houses in the city of Denver. The first seven defendants may be described as distributors, that is to say, they are corporations which make and lease or rent for exhibition purposes films and advertising matter that are necessary and customarily used in the operation of moving picture theaters. The next ten individual defendants named are members of the so-called Denver Code Grievance Board, a body created pursuant to the National Industrial Recovery Act § 1 et seq. (15 USCA § 701 et seq.), and charged with certain duties in respect to the moving picture industry and the code adopted for that industry, and purport to pass upon grievances, so-called, or questions arising in that particular industry in Denver. The other defendants, the Denham Theaters, Inc., and the International Amusement Company, are rival moving picture exhibitors.

The plaintiffs set up in their bill that their business is solely dependent upon their ability to secure moving pictures to exhibit in their theaters, and that without a continuous supply of moving pictures they would have to close their theaters, and suffer irreparable loss and damage, and point out that they have large investments in these theaters, pay a great amount of taxes, employ many people, and do a very extensive business. It is then alleged that the plaintiffs have individual contracts with the ten distributors, according to which they obtain their supply of moving pictures, advertising matter, and other incidental features used in their theaters. The plaintiffs further allege that they are not engaged in interstate commerce, but, on the contrary, are engaged only in intrastate commerce; that they have not subscribed to or signed the code, denominated I believe as the code of fair competition, for their particular industry. They next allege that they for some time past have been and are now engaged in giving away, weekly, a Ford automobile under a plan of chance drawings by the public of the city of Denver for the purpose of advertising and attracting the Denver public and prospective patrons to their theaters; that they distribute large numbers of free tokens or tickets for the drawings in various public places gratis without directly or indirectly exacting or charging or accepting any consideration therefor, and claim the practice is lawful under the laws of Colorado, and does not constitute gambling. They then allege that the code of fair competition sets up certain restrictions, regulations, and inhibitions upon exhibitors of motion pictures, one of which is that no exhibitor shall lower the admission prices publicly announced, or advertise his theater by giving rebates in the form of prizes or any other methods or devices which shall directly or indirectly lower, or tend to lower, the announced admission price, and that the giving of rebates such as premiums in the form of gifts, drawings, etc., is included in these said provisions above referred to; that it is provided that in case any exhibitor is found, after notice and hearing by this local board, to have violated this restriction or rule, the local board under the law has power to order him to cease and desist from such practice; that in the event he refuses they have power to request or demand that the distributors shall refuse to make further deliveries of films or pictures to such exhibitor. They then allege that the defendants entered into an unlawful conspiracy, through the use of this code, to injure the plaintiffs in their business, and that as a result thereof certain complaints against the plaintiffs were lodged with the grievance board, to wit, that the plaintiffs were giving away a Ford car each week by means of the chance drawings, and that on September 5, 1934, the board made and entered a pretended finding and determination and a pretended order against plaintiffs to cease and desist, which order is attached to the complaint as an exhibit, the order requiring them to desist from advertising and attracting patrons in the manner aforesaid, and from holding or conducting such lottery or drawings. They then allege that the plaintiffs have disregarded and are now disregarding such orders, and that therefore this board directed and ordered the distributors to refuse to do business with the plaintiffs, and that they refuse to make further deliveries of films to the plaintiffs under the existing contracts between the plaintiffs and the distributors after a certain date. Plaintiffs then allege that unless this court enjoins and restrains this board and the distributors, the latter will refuse to make deliveries of motion picture films, will breach their contracts, and thus do the plaintiffs irreparable harm.

The matter has been fully and ably argued. Some evidence has been taken in support of the allegations of the bill, and also on behalf of the defendants; the grievance board being represented by the United States Attorney. The distributors have ap-

peared and stated their position to be, in effect, that they are taking no part in this litigation; that they consider themselves bound by the motion picture code to which they have subscribed; and that they feel it their duty under the law to comply therewith until they are advised by some court that it is not binding upon them.

The argument and the issues present a great variety of legal questions. In this brief opinion it will be impossible to cover all the questions raised, nor is it necessary to go into all of them. There are two questions which I think are decisive of this application.

■ First, the bill fails to set out and the proof fails in facts supporting the allegations of a conspiracy or combination between the defendants or any of them to boycott and injure the plaintiffs. The most that the allegations prove or the evidence establishes in this respect is that the defendants feel that they are bound by the National Industrial Recovery Act and that part of it applicable to their particular industry; that, like many other good citizens, they have subscribed to the code promulgated pursuant to this statute for the government of their particular industry, and are attempting to live up to it; that, having received an order from this grievance board to desist from supplying pictures to the plaintiffs unless the plaintiffs comply with the cease and desist order of the board, they feel they are bound by the law to comply with that order. That is a far cry from establishing a conspiracy. It cannot be said that the defendants, directly or indirectly, have a conspiracy or an agreement among themselves, or that there is any concert of action among them to consciously do any injury to the plaintiffs in the conduct of the plaintiffs' business. The mere fact that they are all complying with what they, rightly or wrongly, conceive to be their duty under the code, does not establish a conspiracy.

■ The second and most important question is the issue raised by the motion to dismiss—plaintiffs' standing in a court of equity. Defendants say that the plaintiffs are not here with clean hands, and therefore not entitled to equitable relief, irrespective of what their rights may be on the law side of the court. It must be borne in mind that this suit is on the equity side of the court. Plaintiffs are appealing to the chancellor, and asking him to exercise an extraordinary remedy, the writ of injunction, and that it be put forth in their behalf before the final issues are made up or the case finally tried. It is an axiom of equity under such circumstances that this extraordinary remedy be only exercised in the clearest of cases, and upon the plaintiffs showing that a refusal to grant the temporary relief will result in great and irreparable injury, and that their right thereto is clear.

■■ It seems that when the plaintiffs first devised this scheme of giving away a Ford automobile by drawings or a lottery conducted at their theaters weekly, in order to obtain a ticket or chance in this drawing a person had to go to one of the plaintiffs' theaters, it didn't make any difference which one, and buy an admission, and that after buying the admission ticket and entering the theater he was given a free coupon or ticket with a number, which entitled him to participate in the weekly drawing for the automobile. It was an additional requirement that he be present in one of the plaintiffs' theaters on the Tuesday night when the drawing took place; otherwise he could not participate although his coupon might be drawn as the winning number. Clearly that scheme or method of conducting the lottery was a violation of the laws of Colorado under the statute and the construction thereof by the highest court of the state, and of the federal laws had the mails been used in connection therewith. A consideration was paid, there was a chance taken, the drawing was by lot, and the winner of the automobile obtained something for nothing or that had a value far in excess of what he paid. Shortly thereafter the plan was changed, and, as now conducted and objected to by the code board, has been modified to the extent only that a number of the tickets for the Ford are given away at drug stores and other places of public resort in Denver. The holders of those tickets are not required to buy an admission, but must deposit their coupons in a box at the theaters. According to the testimony, however, the great majority of the tickets given away are still distributed at the theaters to the paid patrons. For instance, the evidence shows that in the month of July 534,000 tickets were distributed, of which 354,000 were given to patrons at the theaters who bought admissions and thereupon received tickets for the drawings, and that 180,000 were given away outside of the theaters to anybody that the distributors of these tickets might happen to meet on the street or in public places, such as drug stores; that the holders of these tickets were required to deposit the cou-

pons at the theaters, but not to pay admission, and were required to be in front of the theaters on Tuesday nights, and the winners were announced outside as well as inside the theaters. If a person on the outside held the winning ticket he was admitted free of charge into the theater and entitled to the automobile. This change, in my opinion, was one in form rather than in substance, and I still think it violates the statutes of the state as to those paying for their admissions. I do not feel this court has to determine that question, however, because the plan is one that is in its essence gambling. It appeals to the cupidity of the public and is opposed to public policy and good business ethics. Its success proves this. Furthermore, whether it is finally held that the motion picture code is lawful or not, or whether it has jurisdiction over these particular plaintiffs, nevertheless the decision of this grievance board, to my mind, represents the judgment and views of this particular industry as a whole. Its findings that this practice violates the code of good ethics or practices of this particular industry are entitled to great weight with the court. When all the people engaged in any industry get together and draw up a code for the proper conduct of their own business, and forbid certain practices, it is an indication of how the plaintiffs' own industry feels about such practices irrespective of whether it has the force of law or not. Further, on this question of coming into court with clean hands, it is the law that practices complained of or which bar the suitor before the chancellor from equitable relief do not have to be practices which of themselves would subject the party to prosecution under the criminal laws of the state. There is a large field of conduct lying between what violates and is denounced by the criminal laws of the state, and what is equitable and fair conduct in cases of this kind. I feel that this practice of giving away automobiles through a lottery comes in that zone, especially when the very industry itself, of which the plaintiffs are a part, has denounced it as an unfair practice and detrimental to the best interests of that industry.

The misconduct need not necessarily be of such a nature as to be punishable as a crime, or actually fraudulent, or constitute the basis of legal action. As was said in one case, Deweese v. Reinhard, 165 U. S. 386, at page 390, 17 S. Ct. 340, 341, 41 L. Ed. 757, "A court of equity acts only when and as conscience commands; and, if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses, and whatever use he may make of them in a court of law, he will be held remediless in a court of equity."

■ The unconscionable character of a transaction need not be pleaded. Whenever it is disclosed the court will of its own motion apply the maxim at any stage of the proceedings.

■ I do not think it is necessary at this time to pass upon the constitutionality of the motion picture code or the N. R. A. so far as it applies to this case, nor whether the plaintiffs are engaged in interstate commerce or purely intrastate commerce. The questions may be reserved for final hearing. The whole case revolves about this so-called lottery scheme. That is the sole and only thing that the plaintiffs complain of, to wit, the ruling of this grievance board. It affects them, not in their conduct of their business of moving picture exhibitors, but merely prohibits them from conducting a particular kind of advertising or method of attracting patrons to their theaters. This board has not attempted in any way to dictate to the plaintiffs how they shall conduct their theaters, has not restricted the price of admission or type of pictures they shall show, and, so far as this record shows, has not in any way interfered with plaintiffs in their business as moving picture theater operators. It merely objects to a certain advertising practice, which, irrespective of its merits, is not an essential or integral part of their business. If the plaintiffs are compelled to desist from it, in my way of looking at it, it really does not affect the industry in which they are engaged. Upon giving it up they may still conduct their business as they did formerly in so far as their business of exhibiting moving pictures is concerned.

In final analysis the only question here involved is this doubtful practice or method of the plaintiffs designed to attract the public to its theaters. It has none of the attributes of a property right of a nature justifying the interposition of a court of equity for its protection as such, and even if the plaintiff is compelled to abandon it, it means only that he will conduct his business as others in the same industry do.

For these reasons no fundamental question is raised in respect to the moving picture industry as such or the effect of the so-called code upon the plaintiffs' business. All the evidence and argument has involved this

one practice only. To grant the relief asked for here would require the court to approve of this questionable practice, something this court feels it is not called upon at this time to do.

■ Furthermore, it is to be observed that the contracts between the plaintiffs and the distributors, and which it is alleged they will violate unless this injunctive relief is granted, some of them at least contain provisions making the code or certain parts of the code part of the contracts, so when the plaintiffs entered into these contracts they were put on notice that in certain particulars at least the contracts would be subject to the provisions of the code and rulings made thereunder such as here complained of. It is, of course, a well-known rule of law that any contract entered into embodies in it all the law of the land in existence at the time the contract is made and any others made thereafter.

For these reasons, the application for temporary injunctive relief will be denied without prejudice to the final hearing, and the plaintiffs may have their exceptions.