**67 P.(2d) 286**

## CITY OF ROSWELL v. JONES et al.

### No. 4205.

Supreme Court of New Mexico.

April 12, 1937.

H. C. Buchly and G. T. Watts, both of Roswell, for appellant.

George Threlkeld, of Roswell, for appellees.

Frank H. Patton, Atty. Gen., and Edward P. Chase, Asst. Atty. Gen., amicus curiæ.

ZINN, Justice.

Appellees were charged with violating Ordinance 397, Section 3, of the Municipal Ordinances of Roswell, in permitting a lottery device to be conducted in the place of business operated by the appellees. The place of business is the Yucca Theatre, owned by R. C. Griffiths Theatres, Inc., and the alleged lottery device is what is commonly known as "Bank Night."

In the police magistrate's court the appellees were found guilty and fined $25 each. They appealed to the district court where the cause was tried de novo. The district court ruled that:

" * * * the device complained of does not constitute a lottery device in that the participants in 'Bank Night' pay nothing to either register or participate in the drawing, it being equally free to those who do not even purchase a ticket as to those who do purchase a ticket, there being no consideration for the chance to win, and as a conclusion the court finds no violation of the ordinance."

The court discharged the appellees, dismissed the complaint, and the City of Roswell prosecutes this appeal from such judgment. The Attorney General enters his appearance amicus curiæ in support of the City of Roswell.

"Bank Night" as operated by appellees is similar to the plan considered by many courts in cases herein cited. It is the usual plan of free registration, the drawing of a number corresponding to a number in the registration book, and the presence of participants required inside or outside of the theatre at the time of the drawing, and the awarding of a cash prize to the person whose number is called, if such person is present either in the theatre or immediately outside. The plan is described in detail

in many of the cases to which we refer. Any variations in details between the cited cases and the facts before us are immaterial.

We do not have a legislative definition of lottery in New Mexico. In 1889, the Territorial Legislature of New Mexico enacted a statute in relation to lotteries. Laws 1889, c. 47 (Comp.St.1929, § 35-3803, et seq.)

Section 1 of said act (Comp.St.1929, § 35-3803) provides, as follows: "Whoever shall set up, draw, manage, or otherwise promote any lottery for money or any other thing of value, or dispose of, or promote the disposing of, any money or thing of value by way of lottery, or aid in committing any of said offenses, shall be fined five hundred to ten thousand dollars."

■ The Attorney General in his brief defines a lottery as: "* * * a game of hazard in which small sums of money are ventured for the chance of obtaining a larger value in money or other articles."

We agree with the Attorney General when he says this definition is sensible and true.

The devices and schemes which some courts have condemned and other courts have refused to condemn as lotteries, are as varied as the ingenuity of man can devise. Generally the different devices and plans can be placed into two categories. On the one hand the lottery where tickets are sold for a cash consideration, the prize may either be a large sum of cash or an article of value, and the winner is determined by lot. The purchaser is not limited in the number of tickets or chances he may purchase, and the operators of the lottery withhold from the receipts of the sale of tickets an amount to defray the expenses of the lottery and also a profit. This plan is universally outlawed under statutes similar to ours.

On the other hand, we have devices and schemes akin to a lottery which are used to promote the sale of goods or services or to increase patronage in profit enterprises. "Bank Night" comes within the latter class.

The courts are divided in their views when construing the latter class or devices which might be termed "akin to a lottery." Even these fall into two groups. In one group it will be found that the prize tickets were only furnished to customers—those who purchased something. The payment made by the customer was for both the article purchased and the prize ticket—part of the consideration was for the ticket. The vast majority of the cases hold these schemes to be lotteries. State v. Powell, 170 Minn. 239, 212 N.W. 169, and Matta v. Katsoulas, 192 Wis. 212, 212 N.W. 261, 50 A.L.R. 291, are typical of this group. The decisions, however, are not entirely uniform in holding even such a scheme to be a lottery. R. J. Williams Furniture Co. v. McComb Chamber of Commerce, 147 Miss. 649, 112 So. 579, 57 A.L.R. 421, holds it not to be.

In the group similar to "Bank Night" will be found the cases where the distribution of prize tickets is purported to be both

to noncustomers as well as to customers. In considering such schemes the courts are hopelessly divided.

In the early case of Yellow-Stone Kit v. State (1890) 88 Ala. 196, 7 So. 338, 7 L.R.A. 599, 16 Am.St.Rep. 38, the court said:

"There is no law which prohibits the gratuitous distribution of one's property by lot or chance. If the distribution is a pure gift or bounty, and not in name or pretense merely, which is designed to evade the law, —if it be entirely unsupported by any valuable consideration moving from the taker, —there is nothing in this mode of conferring it which is violative of the policy of our statutes condemning lotteries, or gaming. We may go further, and say that there would seem to be nothing contrary to public policy, or per se morally wrong, in the determination of rights by lots. * * * The gratuitous distribution of money or property by lot has never prevailed to such extent as to require police regulation at the hands of the state, nor, so long as human nature remains as it now is and has been for so many thousand years, is it likely ever to be otherwise. The history of lotteries for the past three centuries in England, and for nearly a hundred years in America, shows that they have been schemes for the distribution of money or property by lot in which chances were sold for money, either directly, or through some cunning device. The evil flowing from them has been the cultivation of the gambling spirit,—the hazarding the money with the hope by chance of obtaining a larger sum,—often stimulating an inordinate love of gain, arousing the most violent passions of one's baser nature, sometimes tempting the gambler to risk all he possesses on the turn of a single card or cast of a single die, and 'tending, as centuries of human experience now fully attest, to mendicancy and idleness on the one hand, and moral profligacy and debauchery on the other.'"

In the case of State v. Danz, 140 Wash. 546, 250 P. 37, 48 A.L.R. 1109, the Supreme Court of Washington, by a five to four decision, held a scheme resembling that presented in this case to be a lottery.

In the case of People v. Cardas, 137 Cal. App.(Supp.) 788, 28 P.(2d) 99, 100, 101, the court in considering a plan similar to "Bank Night" said: "Our conclusion is that the holders of the prize tickets did not pay a valuable consideration for the chance of winning the prize—did not hazard anything of value upon the chance—and consequently the scheme was not a lottery, and therefore the defendant was not guilty of having violated sections 320 and 321 of the Penal Code."

In Glover et al. v. Malloska, 238 Mich. 216, 213 N.W. 107, loc.cit. 108, 52 A.L.R. 77, the Michigan court in considering a scheme similar in its nature to "Bank Night" said:

"The scheme was clearly a lottery. People v. McPhee, 139 Mich. 687, 103 N.W. 174, 69 L.R.A. 505, 5 Ann.Cas. 835; People v. Wassmus, 214 Mich. 42, 182 N.W. 66. The often asserted essentials of a lottery, viz. consideration, prize, and chance, were all present. Malloska sold the tickets to his

customers for distribution by them in the course of trade to further his pecuniary interest, and this established consideration. The fact that Malloska gave some tickets away at fairs and exhibitions and the purchasers of tickets for use in the retail trade gave them away, without pay, to their customers, and sometimes to others, did not at all save the scheme from being a lottery."

In Society Theatre et al. v. Seattle, 118 Wash. 258, 203 P. 21, 22, the Supreme Court of Washington said: "But while the patrons may not pay, and the respondents may not receive any direct consideration, there is an indirect consideration paid and received. The fact that prizes of more or less value are to be distributed will attract persons to the theaters who would not otherwise attend. In this manner those obtaining prizes pay consideration for them, and the theaters reap a direct financial benefit."

In the case of State v. Hundling, 220 Iowa, 1369, 264 N.W. 608, 103 A.L.R. 861, the Supreme Court of the State of Iowa reached the conclusion that in "Bank Night" the element of consideration was absent and not a lottery. "Bank Night" was considered in the case of State v. Eames, 87 N.H. 477, 183 A. 590, 592. The court arrived at the same conclusion as the Iowa court. The Iowa and New Hampshire courts held that the participant did not pay a valuable consideration for the chance to participate, and that the scheme, therefore, did not constitute a violation of the lottery statutes.

A plan or scheme similar to the one we are considering was up before the Supreme Judicial Court of Massachusetts, which held the plan to be a lottery. Commonwealth v. Wall, 3 N.E.(2d) 28, 29, 30. The Massachusetts court attempted to distinguish its ruling from the Eames Case, on the theory that the New Hampshire court found that "free participation is a reality." However, the plans considered by the New Hampshire and Massachusetts courts were identical. The distinction attempted to be made by the Massachusetts court is without a difference.

In General Theatres v. Metro-Goldwyn-Mayer Distributing Corporation (D.C.) 9 F. Supp. 546, in a case where the plan was somewhat similar to "Bank Night," District Judge Symes ruled that the scheme was a lottery in violation of the laws of Colorado. This case was cited with approval in Central States Theatre Corporation v. Patz et al. (D.C.) 11 F.Supp. 566, decided May 10, 1935, by District Judge Dewey, of the Southern District of Iowa, Central Division. However, in the two Federal cases the District Judges did not analyze their own reasons for ruling the scheme a lottery, but merely stated their belief that the scheme was a lottery and decided accordingly.

We have read and considered many other cases where the question involving the identical "Bank Night" scheme, or devices similar thereto were considered. We see no value in lengthening the opinion by citing from them.

The definition quoted by the Attorney General distinguishes the true lottery, lotteries which are gambling propositions, such as the Louisiana lottery, Mexican lottery and

Irish sweepstakes, from lottery, schemes, or gift devices which use prize and chance to push the sale of goods or services or to increase patronage in profit enterprises.

In construing "Bank Night" and schemes akin thereto as either being lotteries or not, the courts are divided because some hold that such a scheme, having the three elements, to wit, prize, chance, and consideration, is a lottery, whereas other courts fail to find the element of consideration,. and rule that such a scheme is not a lottery. The former fail to point out or forget the evil aimed at.

█ We prefer to reason the matter in our own way, going to the fundamental reason for banning lottery schemes. The mere finding of the three elements necessary to constitute a lottery, to wit, prize, chance, and consideration is not sufficient. These elements are often found in innocent games of amusement or in the distribution of gifts by legitimate and responsible merchandising firms, with no intent to encourage or participate in a gambling scheme.

█ "When, however, the community at large is invited to come in, a new and very serious objection springs up. Independently of the opportunity for fraud by the managers of such enterprises, their publication imparts an excited spirit of gambling to the public generally. On the one side, often ensue gross cases of deception as to the scheme itself; on the other, the sacrifice of the savings by the ignorant and credulous, and excitement, destructive of regular industry, often inducing insanity. *It is to suppress* *this species of lottery, we should remember, that the lottery statutes are aimed."* (Italics ours.) Wharton's Criminal Law, vol. 2, p. 2075, part section 1778.

In The Americana, vol. 17, p. 670, we find the following: "Lottery, a public gambling scheme, by which, for a valuable consideration, one may by favor of the lot obtain a prize of a value superior to the amount or value of that which he risks. In its best and most frequent application, the word describes those schemes of this nature which are conducted under the supervision and guaranty of government, and the proceeds of which are devoted to public objects. Almost all modern states have, at some period of their history, employed lotteries as a means of revenue. But though they supply a ready mode ·of replenishing the public treasury, they have always been found to exert a mischievous influence upon the people. The poor are invited by them rather than the rich. They are diverted from persistent labor and patient thrift by the hope of sudden and splendid gains; and as it is the professed principle of these schemes to withhold a large part of their receipts, a necessary loss falls upon that class which can least afford to bear it."

In volume 7 of the New Standard Encyclopedia we find: "Lottery, a scheme for the distribution of prizes by chance. Lotteries like every other species of gambling have a pernicious influence on the character of those concerned in them. As this kind of gambling can be carried on secretly and the temptations are thrown in the way of both sexes, all ages and all descriptions of

persons, it spreads widely in a community, and thus silently infects the sober, economical, and industrious habits of a people."

■ The Supreme Court of Colorado, in Cross v. People, 18 Colo. 321, 32 P. 821, 822, 36 Am.St.Rep. 292, has stated certain principles with respect to lotteries which we believe are fundamental and sound. The court said:

"The gratuitous distribution of property by lot or chance, if not resorted to as a device to evade the law, and no consideration is derived, directly or indirectly, from the party receiving the chance, does not constitute the offense. In such case the party receiving the chance is not induced to hazard money with the hope of obtaining a larger value, or to part with his money at all; *and the spirit of gambling is in no way cultivated or stimulated, which is the essential evil of lotteries, and which our statute is enacted to prevent.*" (Italics ours.)

In the Colorado case it was shown that the plaintiffs in error gave business cards, which entitled the holders to a chance on a piano, to be distributed as the holders of such chances might elect. These tickets or chances were given indiscriminately to persons, whether they purchased goods of plaintiffs in error or not, to those who registered their names at their shoe store, and to those who, from a distance, sent the return postage. Purchase of goods was not a condition upon which the card was delivered. The fact that such cards or chances were given away to induce persons to visit their store with the expectation that they might purchase goods, and thereby increase their trade, the Colorado court said:

"* * * is a benefit too remote to constitute a consideration for the chances. Persons holding these cards, although not present, were, equally with those visiting their store, entitled to draw the prize. The element of gambling that is necessary to constitute this a lottery within the purview of the statute, to wit, the paying of money, directly or indirectly, for the chance of drawing the piano, is lacking, and the transaction did not constitute a violation of the statute."

■ The giving away of property or prizes is not unlawful, nor is the gift made unlawful by the fact that the recipient is determined by lot. 38 C.J. 286, defines a "lottery" as follows: "A species of gambling which may be defined as a scheme for the distribution of prizes or things of value by lot or chance among persons who have paid, or agreed to pay, a valuable consideration for the chance to obtain a prize; or as a game of hazard in which small sums of money are ventured for the chance of obtaining a larger value, in money or other articles."

This is the generally accepted meaning of the term, especially when used in criminal statutes. 17 R.C.L. 1222; Yellow-Stone Kit v. State, supra; Cross v. People, supra; People v. Cardas, supra; R. J. Williams Furniture Co. v. McComb Chamber of Commerce, supra; People v. Mail & Express Co. (Sp.Sess.) 179 N.Y.S. 640; Id., 192 App.Div. 903, 182 N.Y.S. 943.

■ The term "lottery," as popularly and generally used, refers to *a gambling scheme* in which chances are sold or disposed of for value, and the sums thus paid are hazarded in the hope of winning a much larger sum. That is the predominant characteristic of lotteries which have become known to history. The evil which attends such a lottery is that it arouses the gambling spirit and leads people to hazard their substance on a mere chance. It is undoubtedly the evil against which our statute is directed. Every scheme of advertising, including the giving away of premiums and prizes, naturally has for its object, not purely a philanthropic purpose, but increased business. Even the corner grocer who gives candy or miniature bicycles to the children of the neighborhood may be prompted by that motive, but that does not make the gift unlawful. And if the grocer, instead of giving candy or a wagon to all the children, gives it only to some as determined by lot, that circumstance does not make the gift unlawful. And in neither event is the gift made unlawful by the further circumstance that the business of the grocer in the neighborhood may be thereby increased. Profit accruing remotely and indirectly to the person who gives the prize is not a substitute for the requirement that he who has the chance to win the prize must pay a valuable consideration therefor, in order to make the scheme a lottery.

■ The spirit of gambling, the squandering of savings, the evils aimed at by our lottery statute, can no more be found in "Bank Night" than can be found in the numerous advertising schemes seen daily where thousands of dollars are given away as prizes to "slogan coiners" or "lucky guessers" who send to the manufacturer a wrapper from a can of soup or bar of soap.

In the case of People v. Cardas, supra, the California court applies the test properly. It there considered a scheme almost identical in its essential characteristics with the case at bar. The prize was a ticket for a round trip to Catalina Island. It was awarded by lot among persons who held tickets which had been distributed without charge to people generally in the community. The winner was permitted to enter the theatre without the payment of admission in order to receive the prize, as in the case at bar. The court held that, since the holder of the chance acquired it as a gift and without the payment of any valuable consideration, the scheme was not a lottery; that, unless the holder of the chance hazards something of value for the chance, the scheme is not a lottery. The case is sustained by reason and common sense. It is in harmony with the recognized definitions of a true lottery, the definition given by the Attorney General as previously set out herein, and the supporting citations. Being present at the Yucca Theatre, either inside looking at "Mickey Mouse" or "Greta Garbo" or on the outside of the place where the prize is given, and where it costs nothing to be, cannot be said to be the payment of a valuable consideration, and this is so even though the donor of the prize may receive some direct or indirect benefit from such presence.

The Supreme Court of New Hampshire in State v. Eames, supra, said: "The problem presented by 'Bank Night' and similar schemes is to determine whether it is an evasion of the statute or an avoidance of it, and this question is essentially one of fact. * * * The test by which to determine the answer to this question is not to inquire into the theoretical possibilities of the scheme, but to examine it in actual practical operation. If * * * 'the great majority of people pay for such privilege,' then it is an evasion and as such is not to be countenanced. * * * [If,] however, free participation is a reality, * * * then, regardless of the motive which induced the defendant to give such free participation, the scheme is not within the ban of the statute. Violation is shown only when, regardless of the subtlety of the device employed, the state can prove that, as a matter of fact, the scheme in actual operation results in the payment, in the great majority of cases, of something of value for the opportunity to participate."

Although signing one's name in a book or appearing at the theatre within five minutes of the time of the drawing might be regarded as consideration, it cannot be called "pay" without warping the word out of all recognition. It clearly is not " * * * a game of hazard in which small sums of money are ventured for the chance of obtaining a larger value in money or other articles."

For the reasons given, the judgment of the trial court will be sustained.

It is so ordered.

HUDSPETH, C. J., and BICKLEY, J., concur.

BRICE, J., did not participate.

SADLER, Justice (dissenting).

The scheme or device exposed in the record before us represents an unfair business practice. However, this fact does not condemn it as a lottery unless three essential elements appear, namely, (1) chance, (2) prize, and (3) consideration. Two— chance and prize—admittedly are present. A supposed absence of the third—consideration—as held by the majority, alone supports their conclusion. The statement in the prevailing opinion that the mere presence of the three elements, chance, prize, and consideration, is not sufficient to constitute a lottery is obiter dictum in view of their holding that there is here no consideration. If the dictum be the law, a no man's land of uncertainty prevails, and the question ever persists: When is a lottery not a lottery? Without aid of the test heretofore employed, that it is a lottery if the three elements, chance, prize, and consideration appear in the transaction, the courts in each instance must supply the answer according as the judges may feel the scheme involved does or does not promote the evil aimed at.

I find no difficulty in seeing the consideration which stamps this scheme a lottery. The patrons drawn to the theater in the hope of gaining the prize money *collectively* furnish the *prize money itself* as well as a profit to the proprietor. Thus consid-

eration arises as an inseparable incident to increased attendance.

Willis v. Young [1907] 1 K.B. 448, presents a device with similar earmarks. The proprietors of a weekly newspaper caused medals to be distributed gratuitously to the public. Each medal bore a distinctive number and the words, "Keep this it may be worth 100*l*. See the *Weekly Telegraph* to-day." The winning numbers, arbitrarily selected by the newspaper proprietors, were unknown to distributors of the medals, but were published weekly in the newspapers. It was not necessary that the holder of a medal should purchase a copy of the paper as a condition of receiving a prize. Indeed, no medal would be given out with the purchase of a paper, but could be had free for the asking. Information as to the winning numbers could be had without charge at the newspaper office. The object of the scheme was to induce persons to inspect or buy the paper and its circulation increased substantially during the time the scheme had been carried on. Lord Alverstone, Chief Justice, holding the scheme a lottery, said:

"I cannot entertain a doubt that the decision of the learned magistrate was wrong, and that the respondents ought to have been convicted of the offence charged. We are fully aware of the ingenuity of the gentlemen who originate these schemes, and of their advisers, and doubtless this will not be the last attempt to devise a scheme to keep outside the statute dealing with lotteries; I do not say to evade the statute, for a practice is either within **a**

statute or not. Now it has been admitted by the respondents' counsel that if a coupon had been delivered with each medal, and a charge of a penny had been made, the scheme would undoubtedly have been a lottery, but it is contended that the fact that no charge was made for the medal made all the difference. In my opinion this Court would be stultifying itself were it to give any effect to the ingenious argument by which this ingenious device was supported. * * *"

"If this is an honest scheme, as I assume it to be, the suggestion is that there appear periodically in the paper announcements of the names of the prize winners, and that many hundreds of pounds are given away to them. The money for the prizes, however, comes out of the receipts of the respondents, and these in their turn come, to a considerable extent, from the people who buy the paper, although no doubt the advertisements may bring in a considerable sum. The persons who receive the medals therefore contribute collectively (though each individual may not contribute) sums of money which constitute the fund from which the profits of the newspaper, and also the money for the prize winners in this competition, come. I adopt the definitions of 'lottery' which have been cited to us in the present case, and, looking at the real substance of the scheme, I think that it falls within the narrowest and most limited definition of a lottery, though it is not necessary for the purpose of our decision to go so far as that. If the scheme had been to deliver

a medal with each copy of the paper to the person buying that copy, there could have been no question that it would have been a lottery; in the present case the mischief is really the same, and an inducement is held out to the same class of people to buy copies of the paper, and I am glad to say that I know of no statute, and of no judicial decision, which compels me to hold that this scheme is not a lottery."

Central States Theatre Corp. v. Patz (D.C.) 11 F.Supp. 566, 568, is a case on all fours with the one in hand. The scheme was held to be a lottery. Judge Dewey spoke on the question of consideration as follows:

"Taking it by its four corners, which the plaintiff insists the court should do in determining the issues of the case, it is very apparent that the increase in the attendance is from those persons who are interested in the drawing and not in the picture, and that they have paid their entrance fee primarily in the hope of being successful on the wheel of fortune. It may be that this number is small in comparison to the whole, but, if it is a lottery as to a few, or a lottery comparatively small in its consideration, it is a lottery nevertheless."

See, also, General Theatres, Inc., v. Metro-Goldwyn-Mayer Distributing Corp. (D.C.) 9 F.Supp. 546, 549; Commonwealth v. Wall (Mass.) 3 N.E.(2d) 28; Society Theatre v. City of Seattle, 118 Wash. 258, 203 P. 21, 22. Also see case notes, 48 A. L.R. 1115; 57 A.L.R. 424. In the Society Theatre Case last cited the Supreme Court of Washington said:

"But it is argued that the element of consideration does not appear because the patrons of the theaters pay no additional consideration for entrance thereto, and pay nothing whatever for the tickets which may entitle them to prizes. But while the patrons may not pay, and the respondents may not receive any direct consideration, there is an indirect consideration paid and received. The fact that prizes of more or less value are to be distributed will attract persons to the theaters who would not otherwise attend. In this manner those obtaining prizes pay consideration for them, and the theaters reap a direct financial benefit."

Judge Symes of the federal bench in our neighboring state of Colorado had no hesitancy in declaring a scheme similar to the one before us to be a lottery. In the General Theatres Case, supra, he said: "If a person on the outside held the winning ticket he was. admitted free of charge into the theater and entitled to the automobile. This change, in my opinion, was one in form rather than in substance, and I still think it violates the statutes of the state as to those paying for their admissions. I do not feel this court has to determine that question, however, because the plan is one that is in its essence gambling. It appeals to the cupidity of the public and is opposed to public policy and good business ethics. Its success proves this."

Seeing in the scheme reviewed all three essential elements, chance, prize, and consideration, I identify it as a lottery. The conclusion follows that the judgment of the district court discharging the defendants should be reversed. Because of a contrary conclusion by the majority, I dissent.