**107 P.2d 324**

**STATE v. JONES et al.**

**No. 4541.**

Supreme Court of New Mexico.

Sept. 23, 1940.

Filo M. Sedillo, Atty. Gen., George Lougee, Asst. Atty. Gen., and G. L. Reese, Sr., Asst. Dist. Atty., of Roswell, for appellant.

George A. Threlkeld, of Roswell, for appellees.

SADLER, Justice.

The State appeals from an order sustaining defendants' motion to quash an information and directing their discharge. They were informed against for conducting a lottery in promoting what is generally known as "Bank Night" at a moving picture theatre in the city of Roswell. The facts are substantially the same as those presented in City of Roswell v. Jones, 41 N.M. 258, 67 P.2d 286, and if that decision is to be followed here, even though declared erroneous, the trial court's action in sustaining the motion to quash should be upheld.

When the question was before us in the former case, there was a divided opinion in the court, the main point of disagreement being over the question whether there was present in the scheme one of the three essential elements necessary to constitute a lottery, namely, consideration. That there were present the other two essential elements, prize and chance, all agreed. Now, the matter is again before us on appeal by the State, and the Attorney General earnestly insists that the former decision was incorrectly decided and asks that it be overruled. This involves a re-examination of the whole question.

Under the plan disclosed by the information, the defendants operate the Yucca Theatre in the city of Roswell and in connection with such operation established in First National Bank of Roswell what is known as "Bank Night Account", the initial deposit being One Hundred ($100)

Dollars, to be disposed of as hereinafter disclosed.

A system of registration was provided, a register being kept in the lobby of the theatre wherein are lines for the registration of those desiring to register, with an identification number opposite the name of the registrant. Admission tickets to the theatre sell for thirty-one (.31¢) cents and moving pictures are regularly shown therein. All purchasers of admission tickets may register, although purchase of a ticket is not a prerequisite to registration and participation in the drawing later held. The great majority of the registrants, however, are those who have purchased tickets.

The names of all registrants are written on small slips of paper and placed in a box and on "Bank Night", which is Thursday night of each week, when the best shows are not put on, a slip of paper bearing the name and number of the registrant is withdrawn from said box and the name of the registrant is publicly announced from the stage of the theatre and also from the back door of the theatre to those waiting outside. If the person whose name is called be either on the inside or outside and answers immediately, he or she is asked to come forward and claim the amount in the bank account on that night, the sum varying from one hundred ($100) to five hundred ($500) dollars or more. If no one answers to the name called, the bank night fund is increased by the sum of thirty-five dollars and carried forward to the next "Bank Night", one week later. The process is then repeated until some one answers immediately to the name called and comes forward to claim the amount in the account for that night and the same is thereupon paid over to the holder of the lucky number.

As a result of this scheme, large numbers of patrons are drawn to the theatre on "Bank Night" in the hope of gaining the prize money and many additional admission tickets are sold which otherwise would not be sold. The patrons thus drawn to the theatre collectively furnish the prize money itself as well as a profit to the proprietors of the theatre. Such is the scheme known as Bank Night as disclosed by the information filed against the defendants. They were charged with conducting a lottery in operating the scheme on the date laid in the information.

The information was drawn under 1929 Comp. § 35-3803, being section 1 of Chapter 47 of Session Laws of 1889. This statute has been in force for more than fifty years and has been construed somewhat recently in City of Roswell v. Jones, supra; State v. Butler, 42 N.M. 271, 76 P.2d 1149; and Harriman Institute of Social Research, Inc., v. Carrie Tingley Crippled Children's Hospital, 43 N.M. 1, 84 P.2d 1088. Section 35-3803, the particular paragraph of the statute which the defendants are charged with violating, reads: "Whoever shall set up, draw, manage, or otherwise promote any lottery for money or any other thing of value, or dispose of, or promote the disposing of,

any money or thing of value by way of lottery, or aid in committing any of said offenses, shall be fined five hundred to ten thousand dollars. (L. '89, Ch. 47, § 1; C.L. '97, § 1327; Code '15, § 1760."

Section 35-3804 prohibits the printing, vending, possessing, selling or offering for sale of lottery tickets. Section 35-3805 makes it an offense to permit any building, house or shop to be used for conducting a lottery or for the sale of lottery tickets; section 35-3806 inveighs against advertising lotteries or the sale of lottery tickets, while section 35-3807 applies all the penalties of the preceding sections to fictitious as well as to real lotteries. Finally, the last section, 35-3808, after using language designed to demonstrate the all embracing character of the preceding sections, whatever disguise may be adopted for the lottery attempted, excepts certain described lotteries under the conditions named when conducted at any fair for the benefit of any church, public library, or religious society, located in this state. The section reads: "The provisions of the five preceding sections shall be construed to apply to every device or devices and only to such device or devices as are commonly called or known as lottery, although designated or called by any other name, but shall not be construed to apply to any sale or drawing of any prize at any fair held in this state for the benefit of any church, public library or religious society, situate or being in this state, or for charitable purposes, *when all the proceeds of such fair shall be expended in this state for the benefit of*

*such church, public library, religious society, or charitable purposes.* (L. '89, Ch. 47, § 6; C.L. '97, § 1332; Code '15, § 1765." (Emphasis ours.)

As noted by this court in the Jones case, supra, we have no statutory definition of a lottery. The court there quoted approvingly from 38 C.J. 286, that text's definition of a lottery "as a game of hazard in which small sums of money are ventured for the chance of obtaining a larger value, in money or other articles" [41 N. M. 258, 67 P.2d 290]. Whatever the form of the definition, and they are many, the test universally employed for detecting a lottery is the presence in the transaction of three elements, prize, chance and consideration. The absence of any one is fatal to identifying the transaction as a lottery. The presence of all three compels its characterization as such.

The history of the statutory exception is discussed in both opinions filed in the Harriman case, supra. Unquestionably, it was the legislative purpose to lift the ban against small lotteries conducted at a fair whose entire proceeds were expended in this state for the benefit of a public library, church or religious society. Although there is in the exception itself no limitation on the size of the lottery which may be conducted under it for charitable or religious purposes, the very condition imposed confines them to petty lotteries. Remove the element of profit from a lottery and its size is greatly curtailed. There is here no claim that Bank Night is conducted for religious or charitable purposes.

Thus, the conclusion is compelled that if the scheme presented be a lottery and does not come strictly within the exception contained in the statute, it lies wholly within its interdiction. And so, we are brought right back to the decisive inquiry whether the scheme operated under the name of Bank Night is a lottery. The answer depends upon whether we find in it the disputed element of consideration, for as already noted, all parties agree that the other two essential elements, prize and chance, are present.

Upon re-examination of the question, giving full weight to our former decision in City of Roswell v. Jones, we are strongly persuaded that the element of consideration is present and that the scheme known as Bank Night set forth in the information before us constitutes a lottery. See Analysis of Bank Night, Williams on Flexible Participation Lotteries, Ch. 12, §§ 207 to 214, pages 128 to 139. See, also, Id., Ch. 13, on question of consideration. In section 215 the author states: "The burden of the 'bank night' offensive is that its service to prospective patrons in registration, assignment of numbers, and the distribution of prizes by chance, is a free and gratuitous service and that its prizes are gifts and without consideration. This position is untenable. The object of this contention is to divorce the registration and offer of prizes by chance from the increase in gross receipts produced thereby. In short, it is an attempt to sever cause from effect, to separate advertising from its results, and to violate established prin-

ciples underlying consideration, offers and acceptances and other features of the law of contracts. Obviously it is a subterfuge."

In a leading English case, Willis v. Young, [1907] 1 K.B. 448, the same contention was made, as here, that because of free participation in the scheme involved, not different in material respects from Bank Night, the element of consideration was lacking. The court held otherwise. Lord Alverstone, Chief Justice, in holding the scheme a lottery, among other things, said: "If this is an honest scheme, as I assume it to be, the suggestion is that there appear periodically in the paper announcements of the names of the prize winners, and that many hundreds of pounds are given away to them. The money for the prizes, however, comes out of the receipts of the respondents, and these in their turn come, to a considerable extent, from the people who buy the paper, although no doubt the advertisements may bring in a considerable sum. The persons who receive the medals therefore contribute collectively (though each individual may not contribute) sums of money which constitute the fund from which the profits of the newspaper, and also the money for prize winners in this competition, come."

In Affiliated Enterprises v. Waller Del. Super., 5 A.2d 257, 260, the court, speaking through Chief Justice Layton, had this to say upon the question of "consideration" in Bank Night schemes, to-wit:

"The deceit in schemes of this nature lies in the pretense of allowing free par-

ticipation, but at the same time surrounding the opportunity with conditions calculated upon a knowledge of human characteristics to induce those attracted by the offer to purchase tickets of admission to the theatre. Looking behind the pretense, and disregarding legalism, nothing is given away. All of the prizes, disarmingly called gratuities, are supported by a mass contribution. The opportunities to participate in the drawing are paid for collectively by the general body of paying patrons, even though individual participants may not pay; and the fund, out of which the prize money and the profits of the theatre come, is created thereby. Willis v. Young et al., 1907, 1 K.B. 448. * * *

"Drawing aside the veil of outward appearance, it is readily enough seen that Bank Night is a scheme conceived in deception having the guise of legitimate advertising. It is based on profit at the expense of the gullible chance taker, and, no doubt, its profits have been tremendous. It pretends to offer a gratuity, whereas, in fact, what is offered is a prize paid out of the funds produced, in part at least, by the scheme itself. It pretends to offer to the theatre proprietor something so entirely within the protection of the law that the licensor has the sole right to use the name, Bank Night, as a trade mark, a pretense denied in Affiliated Enterprises v. Gantz, 10 Cir., 86 F.2d 597, and Affiliated Enterprises v. Gruber, 1 Cir., 86 F.2d 958; and the very contract declared on suggests that the scheme enjoys the protection of the copyright laws, an assumption denied in the last mentioned case."

Many and varied are the schemes devised to evade the lottery statutes, but the courts look through the sham and pretense to observe the plan in its true form. If so viewed, however concealed may be the elements of prize, chance and consideration, it is a lottery, it will be so declared. As said by the Supreme Court of Missouri, in State v. McEwan, 343 Mo. 213, 120 S.W. 2d 1098, 1100, where there was also free participation: "Isaac was blind, and there is an old adage that justice is blind. But justice is only blind in so far as it does not make any distinction between litigants, be they of high or low degree, rich or poor, Jew or Gentile. Justice cannot distinguish one from the other. However, in detecting fraud and deception justice should have the vision to discover them in their true nature no matter how well the design to deceive. The courts would be blind indeed if they could not see that the scheme described in the indictment is a deliberate plan to evade the lottery statute and at the same time attain the result which the statute has prohibited. The history of these cases conclusively shows that the entire scheme is a deliberate plan to evade the lottery statute. Courts have uniformly held that the scheme of 'bank night' is a lottery when the participants therein are limited to those purchasing tickets to the theater. Respondent concedes that to be the law. The plan, as described in the information, attempts to eliminate one of the elements of lottery, that of consideration. In the

practical operation of the scheme the element has not been eliminated because it is not in fact free."

While the decisions in the United States at the time City of Roswell v. Jones was decided were fairly evenly divided, the great weight of authority since then denounces the scheme known as Bank Night and imitations thereof as a lottery. See Grimes v. State, 235 Ala. 192, 178 So. 73, denying certiorari from Alabama Court of Appeals, 178 So. 69; Affiliated Enterprises, Inc., v. Waller, Del.Super., 5 A.2d 257; Little River Theatre Corp. v. State ex rel. Hodge, 135 Fla. 854, 185 So. 855; Barker v. State, 56 Ga.App. 705, 193 S.E. 605; Iris Amusement Corp. v. Kelly, 366 Ill. 256, 8 N.E.2d 648; State ex rel. Beck v. Fox Kansas Theatre Co., 144 Kan. 687, 62 P. 2d 929, 109 A.L.R. 698; United-Detroit Theatres Corp. v. Colonial Theatrical Enterprise, 280 Mich. 425, 273 N.W. 756; State v. McEwan, 343 Mo. 213, 120 S.W. 2d 1098; State ex rel. Dussault v. Fox Missoula Theatre Corp., Mont., 101 P.2d 1065; State ex rel. Hunter v. Fox Beatrice Theatre Corp., 133 Neb. 392, 275 N.W. 605; McFadden v. Bain, 162 Or. 250, 91 P.2d 292; City of Wink v. Griffith Amusement Company, 129 Tex. 40, 100 S.W.2d 695; Cole v. State, 133 Tex.Cr.R. 548, 112 S.W.2d 725; State ex rel. Cowie v. La Crosse Theaters Company, 232 Wis. 153, 286 N.W. 707.

There are decisions since the Jones case taking a different view, to be sure. Simmons v. Randforce Amusement Corpora-tion, 162 Misc. 491, 293 N.Y.S. 745; State v. Stern, 201 Minn. 139, 275 N.W. 626; St. Peter v. Pioneer Theatre Corporation, 227 Iowa 1391, 291 N.W. 164; Affiliated Enterprises, Inc., v. Rock-Ola Mfg. Corp., D.C., 23 F.Supp. 3; State v. Horn, 1 A. 2d 51, 16 N.J.Misc. 319; Darlington Theatres v. Coker, 190 S.C. 282, 2 S.E.2d 782. See, also, annotations in 48 A.L.R. 1115, 57 A.L.R. 424, 103 A.L.R. 866, 109 A.L.R. 709, and 113 A.L.R. 1121, where the cases on Bank Night and similar schemes will be found listed and discussed.

Some of the cases holding the Bank Night scheme not a lottery do so upon the theory that the element of consideration relied upon in cases holding to the contrary is indirect rather than direct. They also eliminate from persuasive consideration many cases branding the scheme a lottery because the question arose in suits in equity rather than in criminal prosecutions. We are quite satisfied that the showing of "consideration" is adequate measured by the usual tests applicable in the law of contracts. And we are not impressed that a given state of facts will answer the definition of a lottery in a suit of one nature and fall short of it when tested in a proceeding of a different kind. It is a lottery when the three elements of prize, chance and consideration concur in the scheme. It is not a lottery where one or more of these elements is absent.

In State v. Fox Beatrice Theatre Corp., supra [133 Neb. 392, 275 N.W. 606], the Supreme Court of Nebraska said: "The

'bank night' system, including the elements of chance, prize and consideration, was taken from its literary vestments and its real nature as a lottery exposed in its nakedness less than a year ago in State v. Fox Kansas Theatre Co., 144 Kan. 687, 62 P. (2d) 929. That case is supported by the great weight of authority and is also reported in 109 A.L.R. 698, where the entire plan is shown in detail, including its origin, and where many cases are considered. By the judgment in that case, the Fox Kansas Theatre Company lost its corporate charter in Kansas for operating a lottery called 'bank night.'"

Continuing the Nebraska court said: "'Bank night' as operated by defendants includes all the evils of an ordinary lottery aggravated, as those evils are, by the appearance of innocence. Its tendency is to draw people without tickets in crowds in front of theaters for something they did not buy or earn, a place of idleness. It encourages in men and women the gambling instinct and the propensity to sustain life on the industry and earnings of others. Idleness, pauperism and crime are some of its bitter fruits. It helps to destroy the initiative essential to individual livelihood and good citizenship. It increases the burdens of law enforcement which fall on the people generally throughout the state, as shown by court records. The lottery laws are directed against these and other evils and it is the duty of courts to give effect to the remedies when properly invoked by prosecuting officers."

We also concur in the view expressed by the Supreme Court of Oregon in McFadden v. Bain, supra [162 Or. 250, 91 P.2d 294], after referring to the cases holding "Bank Night" not a lottery because of the absence of the element of consideration, "that the better reasoned cases hold to the contrary". And as said by the Supreme Court of Wisconsin in State v. La Crosse Theaters Co., supra [232 Wis. 153, 286 N.W. 710]: "We agree with the majority of the courts and hold that the instant scheme constitutes a lottery. Manifestly a lottery is no less a lottery because the management of it gives away numbers entitling participation in the draw to some persons. It is only all the more objectionable because it does not limit the drawees to the persons buying tickets and thus lessens the chance of those who pay for their tickets."

The scheme known as Bank Night as detailed in the information in the case at bar fosters and encourages the very evils the lottery statute was designed to prevent. Having concluded that the former case of City of Roswell v. Jones was erroneously decided, it is hereby overruled.

■ The question then arises as to what effect shall be given this overruling decision. Shall it operate retrospectively and possibly subject to heavy penalties and the stigma of criminal convictions those who, acting in reliance on the former decision, did only that which this court declared, even if erroneously, to be within the law? Or, shall the defendants' acts and conduct be judged by the then unreversed decision

.which stood as the best evidence of what the law was at the time the acts complained of took place and the overruling decision be confined in its operation to acts and conduct occurring after its effective date? In other words, shall our decision overruling City of Roswell v. Jones be given prospective operation only? The plainest principles of justice demand that it should and there is respectable authority, based on sound reason, which affirms our right in a case of this kind, so to order. State v. Bell, 136 N.C. 674, 49 S.E. 163; State v. Longino, 109 Miss. 125, 67 So. 902, Ann.Cas. 1916E, 371; State v. Simanton, 100 Mont. 292, 49 P.2d 981; State v. Whitman, 116 Fla. 196, 150 So. 136, 156 So. 705, 95 A.L. R. 1416; Cf. State v. O'Neil, 147 Ia. 513, 527, 126 N.W. 454, 33 L.R.A.,N.S., 788 (specially concurring opinion of Deemer, C.J., 794 et seq.), Ann.Cas.1912B, 691. See, also, Sunburst Oil & Refining Co. v. Great Northern Railway Co., 91 Mont. 216, 7 P.2d 927, affirmed in 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360, 85 A.L.R. 254; and Hill v. Atlantic & North Carolina Railroad Co., 143 N.C. 539, 55 S.E. 854, 9 L.R.A.,N.S., 606, 624; recent and illuminating article by Professor Orvill C. Snyder in 35 Illinois Law Rev. 121 on "Retrospective Operation of Overruling Decisions"; and article on "Stare Decisis Freed from Baneful Effect" in 19 Journal of American Judicature Society, 37.

The trial judge properly followed City of Roswell v. Jones in sustaining the motion to quash. In denying retrospective operation to our overruling decision, we are governed by the overruled decision in settling the defendants' rights. Accordingly, we affirm the action of the trial court, at the same time announcing that City of Roswell v. Jones will no longer be followed in cases having their origin in acts and conduct occurring subsequent to the effective date of this decision.

It is so ordered.

BRICE, and MABRY, JJ., concur.

BICKLEY, Chief Justice (concurring in part).

The facts in the case at bar are essentially the same as those presented in City of Roswell v. Jones, 41 N.M. 258, 67 P.2d 286.

The Attorney General and co-counsel for appellant state: "It is true that there is a conflict of authorities on this proposition which are not reconcilable, but we believe that the best reasoned cases and the great weight of authority is to the contrary." And elsewhere: "There is considerable diversity of opinion among the courts of different states as to whether there is a consideration in the operation of the scheme generally known as 'bank night'."

The majority say: "While the decisions in the United States at the time City of Roswell v. Jones was decided were fairly evenly divided, the great weight of authority since then denounces the scheme known as Bank Night and imitations thereof as a lottery."

An examination of the fourteen cases listed in support of the present majority view indicates that four of these involved criminal prosecutions. Some are by divided courts. In some, the statutory inhibition was against conducting "gift enterprises" as well as lotteries, and this was deemed of significance. In none was considered a lottery statute comparable to the one here under consideration. In none was any argument presented that we had not considered in City of Roswell v. Jones.

Unquestionably there are decisions of courts of other jurisdictions which we hold in high respect which may be cited as supporting a view contrary to that expressed in City of Roswell v. Jones, supra. But it is to be doubted if any of those courts had under consideration a statute like ours.

It is manifest that many of them approached the matter with an attitude of strict construction, because they recognized the baneful effects of lotteries upon the public. In State v. Butler, 42 N.M. 271, 76 P.2d 1149, 1153, wherein Butler appealed from a conviction of the charge of having lottery tickets in his possession, we observed that the defendant claimed comfort from an expression used by us in the case of City of Roswell v. Jones, supra, that: "The mere finding of the three elements necessary to constitute a lottery, to wit, prize, chance, and consideration is not sufficient." Our comment on this claim was: "It is often said that the gravaman of the offense of conducting a lottery lies not in the wrongful intent of the sponsors, but in the baneful effect upon the public. This is true as a general proposition, but the last section of our lottery statute (1929 Comp.St.Anno., § 35-3808) reads as follows: 'The provisions of the five preceding sections shall be construed to apply to every device or devices and only to such device or devices as are commonly called or known as lottery, although designated or called by any other name, but shall not be construed to apply to any sale or drawing of any prize at any fair held in this state for the benefit of any church, public library or religious society, situate or being in this state, or for charitable purposes, when all the proceeds of such fair shall be expended in this state for the benefit of such church, public library, religious society, or charitable purposes.' "

In Harriman Institute of Social Research v. Carrie Tingley C. C. Hospital, 43 N.M. 1, 84 P.2d 1088, two of the four participating Justices, concurring specially, adverted to the peculiarities of our lottery statute. Those observations are too lengthy for repetition here, it being sufficient to say that these Justices were impressed with the view that our legislature did not intend to outlaw all lotteries, but only "such device or devices as are commonly called or known as lottery." Section 35-3808. These perplexities originating in our statute give rise to a disposition toward less strict construction than that indulged by some courts which are unrestrained by an expressed legislative sanction of some forms of lotteries conducted under the circumstances

detailed in the statute. The defendant in the case at bar does not come within the exception mentioned in the statute and these considerations are mentioned because appellant here again adverts to the language in City of Roswell v. Jones, supra, quoted above, and explained in State v. Butler, supra. Appellant says we did not, in City of Roswell v. Jones, supra, call attention to any scheme or give any reference by example or otherwise, wherein the elements of prize and chance and consideration were present, and yet such scheme would not be a lottery. I think the language employed in the statute is susceptible of the meaning that when considering the elements of prize, chance and consideration we must give the weight, and only the weight, to them appropriate to the evil lotteries inveighed against by our statute. In other words, the terms of our statute invite liberal rather than strict construction, in view of the statute's historical background, as set forth in the specially concurring opinion in the Harriman case. As there suggested, it seems that the legislature did leave a "no man's land" where the elements of prize, chance and consideration alone are not sufficient to stamp the scheme a lottery as "such * * * devices * * * are commonly called or known". As was further suggested by the Justices specially concurring in the Harriman case, the legislature did not intend that a scheme declared to be unlawful would be lawful if conducted for the benefit of a church, public library or religious society in this state. I prefer to think that a "no man's land" was left by the legislature where elements outside of prize, chance and consideration must have a bearing in determining whether the device is such as is "commonly called or known as lottery". Also the peculiar provisions of our statute have a bearing upon the much discussed question of the character of the "consideration" (whether direct or indirect—whether payment of money for a chance in the drawing or whether in the more technical sense as applied to the law of contracts) necessary to be present in the *evil* device "commonly called or known as lottery". Common knowledge among men as to how "a drawing of a prize at any fair held in this state for the benefit of any church, public library or religious society, situate or being in this state, or for charitable purposes" is conducted, does not suggest the absence of prize, chance and consideration. Yet, the legislature sanctioned such device when conducted with such charitable object in view. Mr. Justice Sadler, in his able dissenting opinion in City of Roswell v. Jones, supra, emphasized the difficulties which may confront us in our journeyings in pursuit of truth in this "no man's land". I do not undertake to forecast application of legal principles to future cases. The normal function of courts is, and clearly should be, that of applying rules of law which they announce to *past* transactions. It is a practical necessity that judicial decisions must be made after an event, and that they must, as a general rule, relate back to govern the transaction which provoked the controversy. It is not

our province to chart this no man's land. The legislature may do so when public policy requires. It is interesting to note that although the decision in City of Roswell v. Jones, supra, was handed down April 12, 1937, State v. Butler, February 18, 1938, and in the Harriman case, October 17, 1938, there has been no modification of our lottery statute or legislative interpretation thereof. I have read the able briefs of counsel for the parties and of amici curiæ, and I am not impressed that there is any cogent reason to overrule the decision in City of Roswell v. Jones, supra. The doctrine frequently termed "the rule of stare decisis", to the effect that when a point has once been settled by decision, it forms a precedent which is not afterwards to be departed from or lightly overruled or set aside, is a sound doctrine. This rule has for its object the salutary effect of uniformity, certainty, and stability in the law. It is grounded on public policy and as such is entitled to great weight and must be adhered to, unless the reasons therefor have ceased to exist, are clearly erroneous, or are manifestly wrong. It has been said that a court cannot disregard a former holding conformable to legal principles, and upheld by plentiful authority. That there be plentiful authority supporting a contrary view is not sufficient. While, perhaps, it is more important as to far reaching juridical principles that the court should be right than merely in harmony with previous decisions, in the light of higher civilization, later and more careful examination of authorities, wider and more thorough discussion, and more mature reflection upon the policy of the law, it, nevertheless, is vital that there be stability in the courts in adhering to decisions deliberately made after ample consideration. Parties should not be encouraged to ask re-examination of determined principles and to speculate on a fluctuation of the law with every change in the expounders of it. See 14 Am.Jur., Courts, Secs. 59–61; Duncan v. Brown, 18 N.M. 579, 139 P. 140; Baca v. Chavez, 32 N.M. 210, 252 P. 987.

In the early part of this opinion, I adverted to a comment of the majority as to the present weight of authority. Here again, opinions differ. In State v. Stern, 201 Minn. 139, 275 N.W. 626, 628, the Supreme Court of Minnesota, October 29, 1937, said that in civil proceedings the courts generally say that bank nights and similar schemes akin thereto are lotteries, but that: "In criminal prosecutions the weight of authority is to the effect that bank nights and similar plans to distribute prizes by chance are not lotteries, in that one of the three essential elements, under statutes similar to ours and under the common law, is absent; namely, a consideration given or paid by the participants in the chance." In Darlington Theatres v. Coker, 190 S.C. 282, 2 S.E.2d 782, 788, the South Carolina Supreme Court, May 10, 1939, adopted the opinion of the trial court: "I am constrained to hold that under the overwhelming weight of authority the present case involves no violation of the lottery law of South Carolina." And the court concluded: "If plans of this

nature are inimicable to public welfare, then it would be a matter for legislative action, and not one for the Courts."

I am impressed with the observations of the Court of Special Sessions of New Jersey, Essex County, April 25, 1938, State v. Horn, 1 A.2d 51, 53, 16 N.J.Misc. 319, in holding bank night not a lottery:

"My own viewpoint is that there should be the strict construction indicated in State v. Hundling, supra; and this because first, criminal statutes should be strictly construed, and secondly and more fundamentally, because there is a problem · involved in the construction of our gaming statutes, infinitely more important than the narrow judicial proposition embraced within the four corners of a single issue. This problem is one social in character, and should not be ignored from the standpoint of realism. Our statutes in their essential terminology and application, are such as to create a situation whereby the casual or intermittent offender is brought before the court upon what may be an extremely narrow issue and if the cause is adversely decided as to him, he is branded a criminal for the rest of his life, where there may be all around him violations apparently as obvious, going ignored.

"I am not able to look with complacence on a statutory situation or the construction of such, which serves no purpose except to breed disrespect for the law in its apparent inequalities, and promotes no good social purpose looking toward the control of the vice of gaming."

For the foregoing reasons I concur in affirming the action of the trial court, but I am not persuaded that any cogent reason exists for the Court with the sanction of a bare majority to overrule its former decision. The very disparity of opinion, not only among the members of this Court, but which exists among other courts, strongly suggests the absence of occasion to refuse to adhere to the public policy reflected in the rule of stare decisis. In other words, this conflict of views so widespread seems to refute the idea that it can reasonably be said that our former decision, deliberately made after ample consideration, is *clearly* erroneous, or *manifestly* wrong. Since, however, the majority view the matter otherwise, I approve of the course pursued of making their overruling pronouncement prospective in operation.

ZINN, Justice (concurring in result).

I agree with the opinion of our able CHIEF JUSTICE, except that part of his opinion wherein he approves of the action of the majority in making their overruling pronouncement prospective in operation rather than restrospective.

To approve their action is to sanction a usurpation by the judiciary of a legislative function. We would not permit the Legislature to encroach upon the domain assigned exclusively to us by the Constitution of our State. By what right, other than by a judicial sense of superiority, do we presume to say this shall hereafter be the law which heretofore was not the

law. To announce a rule of substantive law for the future is solely the function of the Legislature. If what the majority say is the law, then it has been the law ever since the Legislature passed the lottery law.

I concur in the result.