84 P.2d 1088

·HARRIMAN INSTITUTE OF SOCIAL RE-
SEARCH, Inc., v. CARRIE TINGLEY
CRIPPLED CHILDREN'S HOSPITAL
(two cases).

No. 4425.

Supreme Court of New Mexico.

Oct. 17, 1938.

Rehearing Denied Dec. 12, 1938.

2

Joseph L. Dailey, John F. Simms, and Waldo H. Rogers, all of Albuquerque, for appellant.

Frank H. Patton, Atty. Gen., Richard E. Manson, Asst. Atty. Gen., and Rodey & Dickason and William A. Sloan, all of Albuquerque, for appellee.

SADLER, Justice.

The question for decision is whether a lottery conducted as part of a fair to be held in this state for the benefit of a charitable institution is legal if less than the gross proceeds of the fair are to be devoted to the charitable purpose. The issue arises out of a suit by The Harriman Institute of Social Research, Inc., a Maryland corporation qualified to do business in New Mexico, as plaintiff, against Carrie Tingley Crippled Children's Hospital, a corporate state institution, as defendant, to determine the legality of certain proposed acts in performance of a contract entered into between them under date of June 17, 1938.

In brief, the complaint sets forth that the Harriman Institute had been active in social research along humanitarian lines; that defendant was organized to provide proper care and treatment for the crippled children of New Mexico and to make available therefor the buildings erected, furnished and equipped for such purpose at Hot Springs, New Mexico; that prior to June 17, 1938, the Harriman Institute had caused a complete investigation and survey to be made of the equipment and purposes of Carrie Tingley Crippled Children's Hospital and that both corporations became convinced that, having similar aims and purposes, if a union of efforts were made such union "would be merely a prelude to the service that could be rendered in future years, not only to New Mexico, but to the nation, by continuing and multiplying the services to humanity offered by petitioner (plaintiff) and defendant, making such services available to crippled children outside of the State of New Mexico, and providing means of research in an effort to eliminate and prevent diseases of children all over the nation."

And so, as the complaint reveals, the two corporations entered into a contract whereby the Harriman Institute undertook to raise the sum of $10,000,000 within the period of three years from June 17, 1938, date of the contract, said moneys to be held in trust for the use and benefit of the defendant. One million dollars of the ten million thus to be raised was to be produced within the period of one year from date of the agreement.

The contract gave plaintiff the exclusive right to solicit and raise funds for the hospital during the period of the agreement, except funds arising from legislative appropriations and fees received from hospitalization of patients. The plaintiff covenanted that in the performance of its contract it would conduct its business strictly in accordance with the laws of the State of New Mexico and of the United States of America.

After execution of the contract, Harriman Institute disclosed its plan to raise the first million dollars of the ten million. agreed to be raised by promoting a fair to be held at Tingley Field in the city of Albuquerque between November 20th and 26th, 1938, consisting of all types of commercial, industrial and artistic exhibits, with large displays of Spanish, Mexican and Indian arts and handicraft for exhibit and sale; also extensive entertainment with many of the most popular stage, screen and radio stars booked for appearance to provide amusement for those attending the fair. Season tickets to the fair were to be sold for $1.00 each, entitling the holder to daily admission. The ticket also entitles the holder to participate in a lottery for cash prizes for each unit of 1,750,000 of such tickets as follows:

| | | | | | |
|---|---|---|---|---|---|
| 250 | prizes of | $ | 500.00 | each | $125,000.00 |
| 100 | " | " | 1,000.00 | " | 100,000.00 |
| 5 | " | " | 10,000.00 | " | 50,000.00 |
| 4 | " | " | 12,500.00 | " | 50,000.00 |
| 3 | " | " | 25,000.00 | " | 75,000.00 |
| 2 | " | " | 50,000.00 | " | 100,000.00 |
| | | | | | $500,000.00 |

The proposed drawings for the cash prizes are planned for Thanksgiving Day, November 24, 1938, the last day of the fair, at Tingley Field in Albuquerque, New Mexico. The presence at the drawing of the holder of a lucky number is not necessary in order to entitle him to receive the cash prize represented by his number. Tickets to the fair are to be sold by authorized agents and sub-agents, each confined to a designated area, the State of' New Mexico having been divided into certain selling districts. The agents are to receive 25% of the sale price of the tickets as their commission. It is proposed to allocate the remainder of the sum realized from the sale of season admission tickets as follows:

(1) 40% thereof to be placed in a trust fund for the purpose of creating the cash prizes set out above.

(2) 25% to be placed in another trust fund for the purpose of covering estimated necessary expenses of the fair.

(3) 35% thereof to go into a trust fund as provided in said contract for the use and benefit of Carrie Tingley Crippled Children's Hospital.

When it came to the attention of the hospital board that plaintiff proposed to raise the initial funds promised by said contract by the sale of tickets for a lottery in connection with a fair, a controversy arose as to whether the plan does not breach the covenant in the contract between the parties that "it (plaintiff) will conduct its business strictly in accordance

with the laws of the State of New Mexico and of the United States of America." Whereupon the Honorable Clyde Tingley, as Governor of New Mexico, called upon Honorable Frank H. Patton, as Attorney General of said state, for an opinion as to the legality of the proposed plan. Its validity was urged by virtue of the so-called exemption in favor of lotteries for charitable purposes contained in 1929 Comp. § 35-3808. Under date of July 29, 1938, Attorney General Patton rendered his opinion holding illegal the plan outlined. Thereupon this suit for declaratory judgment was instituted.

The foregoing facts appearing upon the face of the complaint, the defendant challenged the sufficiency of the facts pleaded to support the relief prayed upon the ground, first, that all the proceeds of the fair proposed to be promoted and conducted by plaintiff were not to be expended for charitable purposes, and, second, that the contract entered into between the two corporations was ultra vires as an unlawful delegation by defendant of the duty conferred and enjoined upon it by Laws 1937, c. 13, of soliciting and "receiving all gifts and bequests and the supervision, management and control of all funds received by defendant." The trial court sustained the first ground of demurrer by holding that the proposed plan was not within the provisions of the exception contained in 1929 Comp. § 35-3808, and therefore was unlawful. It overruled the second ground of the demurrer by holding

that the contract between the plaintiff and defendant was not ultra vires, and was therefore lawful. The plaintiff appealed from said judgment, assigning as error the action of the trial court in sustaining the first ground of the demurrer. The defendant took a cross-appeal, assigning as error the action of the court in overruling the second ground of the demurrer.

A decision of the question presented by the appeal of the Harriman Institute involves the consideration of our lottery statutes, particularly 1929 Comp. § 35-3808 thereof. The act was adopted on February 12, 1889, consisting of six sections. It now appears as 1929 Comp. §§ 35-3803 to 35-3808, inclusive. Section 35-3803 inveighs against promoting lotteries. The next section, 35-3804, penalizes the writing, printing, vending or possessing of any ticket, token or device, purporting to entitle the holder, bearer or any other person to any prize or share or interest therein to be drawn in any lottery in or out of the State. Section 35-3805 makes it a crime to permit "any house, shop or other building" to be used for conducting a lottery or any of its incidents. Advertising a lottery in any manner is proscribed and penalized by § 35-3806, while the following section, 35-3807, condemns and outlaws fictitious lotteries, prescribing penalties. Section 35-3808, the final section of the act, is the one whose meaning becomes the subject of strongest controversy. It reads:

"The provisions of the five preceding sections shall be construed to apply to

every device or devices and only to such device or devices as are commonly called or known as lottery, although designated or called by any other name, but shall not be construed to apply to any sale or drawing of any prize at any fair held in this state for the benefit of any church, public library or religious society, situate or being in this state, or for charitable purposes, when all the proceeds of such fair shall be expended in this state for the benefit of such church, public library, religious society, or charitable purposes. L. '89, Ch. 47, § 6; C.L. '97, § 1332; Code '15, § 1765."

■ The intended meaning of the phrase "all the proceeds", occurring in the exempting language of the preceding section, will be decisive. If it means what, upon its face, it appears to mean, the "entire proceeds", the "gross proceeds", then plaintiff's position is rendered untenable and must be abandoned, since admittedly the plan disclosed does not contemplate a donation to charity of the gross proceeds of the fair. On the other hand, if this phrase means only that the "net proceeds" of the fair shall go to charity in order to avoid the penalties of the statute, the plan is not upon its face illegal. We have concluded that the phrase "all the proceeds" does not mean "the net proceeds"; that the two phrases are opposite in meaning and that the plan revealed for raising the first one million dollars under the contract is therefore illegal. We are brought to this conclusion by the following considerations.

■ The lottery statute (1929 Comp. §§ 35-3803 to 35-3807 inclusive) was enacted to suppress a widespread evil—gambling in lotteries. The legislature of 1889 was not unfamiliar with the noted "Louisiana Lottery" and there were others spread over the country. In City of Roswell v. Jones, 41 N.M. 258, 67 P.2d 286, this court quoted approvingly certain texts upon the pernicious result of widespread participation by the public in lotteries and emphasized the purpose of our own statute as one to curb the evil. We quote from that opinion as follows [page 289]:

"We prefer to reason the matter in our own way, going to the fundamental reason for banning lottery schemes. * * *

" 'When, however, the community at large is invited to come in, a new and very serious objection springs up. Independently of the opportunity for fraud by the managers of such enterprises, their publication imparts an excited spirit of gambling to the public generally. On the one side, often ensue gross cases of deception as to the scheme itself; on the other, the sacrifice of the savings by the ignorant and credulous, and excitement, destructive of regular industry, often inducing insanity. *It is to suppress this species of lottery, we should remember, that the lottery statutes are aimed.*' [Italics in text]. Wharton's Criminal Law, vol. 2, p. 2075, part section 1778. * * *

"In volume 7 of the New Standard Encyclopedia we find: 'Lottery, a scheme for the distribution of prizes by chance. Lotteries

like every other species of gambling have a pernicious influence on the character of those concerned in them. As this kind of gambling can be carried on secretly and the temptations are thrown in the way of both sexes, all ages and all descriptions of persons, it spreads widely in a community, and thus silently infects the sober, economical, and industrious habits of a people.' * * *

"The term 'lottery,' as popularly and generally used, refers to a gambling scheme in which chances are sold or disposed of for value, and the sums thus paid are hazarded in the hope of winning a much larger sum. That is the predominant characteristic of lotteries which have become known to history. *The evil which attends such a lottery is that it arouses the gambling spirit and leads people to hazard their substance on a mere chance. It is undoubtedly the evil against which our statute is directed."* (Italics supplied.)

With this court's pronouncement that the purpose of the statute is as stated, it is readily seen that a lottery conducted on the mammoth scale proposed for this one promotes the very evil which this court has said the statute was designed to prevent.

We thus are confronted by an anomaly in the statute if we adopt plaintiff's contention that the phrase "all the proceeds" means "the net proceeds". Hence, this theory is not to be too readily accepted. In other words, if such a construction permits the evil to flourish in all its pristine growth, we should inquire, at least, if the legislature could so have intended, or did so intend.

Upon its face, it seems incongruous that, after laboring through the enactment of five sections accomplishing an airtight declaration of outlawry against mass gambling in lotteries, the legislature should, in a single sentence in the sixth section, undo all it so painstakingly had just enacted. We do not think it wittingly accomplished this absurdity.

Much was said in oral argument about taking away the profit from the promotion of lotteries and that this one earns not a cent of profit for its promoters, as though removing profit from lotteries were an aim of the statute. But the purpose of the statute is not so much to deny profit to promoters as to prevent widespread participation in lotteries. It eliminates profit from lotteries by outlawing them as an incident only to its greater purpose of preventing altogether mass gambling in lotteries. No profit, no lotteries, or fewer lotteries, was doubtless the logic of the legislative mind. The important thing, the chief end sought by this legislation, undoubtedly was to allay and curb the gambling spirit of the public and thus prevent the waste of money needed for more substantial purposes.

Now the gambling spirit feeds itself with as much relish upon a charity lottery as upon any other kind. If the average person be consumed with a desire to take a chance and get something for nothing, it matters not to him whether the promoter makes a profit or that the profit goes to charity. Indeed, if it does go to charity, his participation wears a cloak of piety

otherwise denied it. He thus may be persuaded to purchase tickets oftener and in larger volume because operated in the name of charity or religion. The point we seek to make is that widespread participation in a charity lottery is just as baneful in its effect upon the public as widespread participation in any other kind of lottery. And we think it will be conceded, indeed we feel this court has said as much, that our lottery statutes sought to prevent widespread participation in *any* kind of lottery.

This brings us to our theory of decision. Undoubtedly the exception in the statute represents an afterthought or compromise which likely was agreed upon even before introduction of the bill. The legislative mind must have been centered upon some particular practice then prevailing in the territory and the act sought to exempt it. The defendant says it was the practice, still extant, of conducting a raffle or lottery for some donated article of food, clothing or other item of personal property, in connection with church or charity fairs and bazaars. That the practice related to lotteries for the sole benefit of a religious society, public library or charity, there can be no doubt. They alone are mentioned in the exempting clause. That they must have been conducted upon a small scale and as a mere incident to the fair or bazaar seems equally obvious. No one suggests that a lottery on the mammoth scale proposed for this one ever heretofore has been held in this state, nor do counsel suggest or call to mind any previous one for the privileged purposes of a size sufficient even to attract attention.

Even so, it is not conclusive against plaintiff's position that the legislative mind was not centered upon such widespread operations under the exemption as the plan proposed, if it employed language unmistakably embracing it. However, when we give to the language of the exemption, "all the proceeds", the meaning which a first reading suggests—"the whole proceeds", "the gross proceeds"—there can be no doubt the present plan is outlawed under plaintiff's admission that only a part of the proceeds of the fair is to be donated to charity.

Thus, by the construction we give the statute, which indeed is no construction at all (the words "all the proceeds" not calling for construction, Vukovich v. St. Louis, Rocky Mt. & Pac. Co., 40 N.M. 374, 60 P. 2d 356), the legislature is not convicted of doing a meaningless and absurd thing—of outlawing and legalizing the same evil in the same act—and the purpose of the statute as declared in City of Roswell v. Jones, supra, is preserved. It is only when we depart from the patent meaning of the words "all the proceeds", when we change by construction this initially suggested, this first-blush meaning to read "the net proceeds", that we encounter difficulty and undo the legislature's painstaking work.

That legal sanction for a lottery under the plan exposed to us would produce mass gambling upon an unprecedented scale in New Mexico, there can be no doubt. An analysis of the working of the plan, the

accuracy of which is not questioned, is taken from the brief of the Attorney General, as follows:

"Here is just how the plan will work out. For every $1.00 ticket sold the following distribution will be made:

| | |
|---|---|
| Agents' Commission | 25¢ |
| Incidental expense | 18¾¢ |
| Prizes | 30¢ |
| Charity (Hospital) | 26¼¢ |

If 1,000,000 tickets are sold the following is the picture:

| | |
|---|---|
| Agent's commission | $250,000 |
| Incidental expense | 187,500 |
| Prizes | 300,000 |
| Charity (Hospital) | 262,000 |

"In order to raise $1,000,000 for the Hospital by means of a lottery, it will be necessary to sell $3,846,200 worth of tickets. In the event that is done, the agents' commissions will roughly amount to some $961,-550."

We are not unmindful that the word "proceeds" has been given varying meanings in decided cases, dependent upon the context of the statute or contract in which it is found. Not infrequently its meaning is controlled by a custom or practice of the particular trade, business or industry to which the contract employing it relates. See In re Roosevelt's Estate, 131 Misc. 800, 228 N.Y.S. 323; In re Dickson's Assigned Estate, 166 Pa. 134, 30 A. 1032; Moss Point Lumber Co. v. Thompson, 83 Miss. 499, 35 So. 828; Troutman v. Polhill, 79 Wash. 390,

140 P. 319. But where no ambiguity arises from the manner of its use, from the context or from a custom in the trade or business in which employed, the word "proceeds" alone without the use of a qualifying adjective such as "gross", "entire" or "all", often has been held to mean "gross proceeds." See Dittemore v. Cable Milling Co., 16 Idaho 298, 101 P. 593, 133 Am.St. Rep. 98; Salisbury v. Spofford, 22 Idaho 393, 126 P. 400; Atchison, T. & S. F. R. v. State ex rel. Sanders, 22 Kan. 1; Staples v. Wheeler, 38 Me. 372; Brown v. Green & Hickey Leather Co., 244 Mass. 168, 138 N. E. 714; McMurphy v. Garland, 47 N.H. 316; Caperton's Adm'rs v. Caperton's Heirs, 36 W.Va. 479, 15 S.E. 257.

Such is the meaning first suggested to our minds by the phrase "all the proceeds" as found in the statute in question. So viewing the matter, to give the phrase the meaning contended for by plaintiff, to our minds, would be the equivalent of having it read "the gross net proceeds." When the legislature used the word *"all"* we think it sought to emphasize the idea that it meant more than a *part* of the proceeds.

The case most relied upon by plaintiff is Commonwealth v. Alexander, 185 Mass. 551, 70 N.E. 1017. The language is not identical with that in the case at bar. The prohibition was against keeping open on the Lord's Day any shop, warehouse or workhouse, or the doing of any labor or business, etc., "except a concert of sacred music or an entertainment given by a religious or charitable society the proceeds of which, if

any, are to be devoted exclusively to a charitable or religious purpose," etc. A divided court held this meant the net proceeds. We should have been helped to such a conclusion by the proviso "if any", although the majority apparently attach no significance to the use of this phrase. Certainly there rarely, if ever, would be an entertainment from which some proceeds did not arise. Hence, the expression "the proceeds of which, *if any*," readily suggests "net" proceeds.

It was argued at submission that since § 35-3808 directs that the preceding five sections shall not be construed to apply to the kind of lottery exempted (for charitable purposes) and since ·§ 35-3803 specifically mentions a lottery for "money", the legislature must have contemplated that ° the money prize would be deducted, thus denying to the phrase "all the proceeds" a meaning of "gross proceeds". This is persuasive but not decisive. For instance, if the purpose of the lottery be to aid in building a church, or furnishing a hospital, a given person charitably disposed might wish to see his donation of $100 or $200 raised to $500 or $1000 from the proceeds of lottery tickets purchased by others, many of whom would otherwise contribute nothing. Thus persuaded, the original donor would make an outright gift of the money prize to be raffled off.

Whether a lottery of the kind outlined in the complaint shall be permitted in New Mexico is purely a matter of legislative policy with which the courts are not concerned. We believe the policy expressed by the statute to be as we have declared it. And, considering the comparative ease with which money can be raised through lotteries and the ever present need of funds for charitable institutions and religious societies, the failure of needy institutions over a period of fifty years to invoke any such license under the statute as that now claimed suggests the legislative policy as declared by us to be that generally accepted by the public at large. The statute permits lotteries, yes; but under the conditions imposed they will always be petty in scope.

Truly, no worthier institution could have been selected to become beneficiary of the large sum proposed to be raised by plaintiff than · Carrie Tingley Crippled Children's Hospital of Hot Springs, New Mexico, for it is engaged in the great humanitarian work of rehabilitating crippled children of this and other states. But the legislature has said the plan proposed for raising the endowment is unlawful. The Attorney General so ruled. The trial court so adjudged and we now affirm its judgment, leaving undetermined, because unnecessary to decide them, the questions raised by defendant's cross-appeal.

It is so ordered.

BRICE, J., concurs.

ZINN, J., did not participate.

BICKLEY, Justice (concurring specially).

"Lotteries are a species of gaming. Formerly they were in our states permitted,

and even established and licensed by law as a means of raising money for worthy objects. But their evils were immense; both in the woes inflicted on the weak-minded and credulous who were induced to buy chances in them, to be followed by bitter disappointments; and in their baneful effects on those termed 'lucky' who drew the prizes. Later, under the influence of a healthier public sentiment, they were pretty generally forbidden." Bishop, Statutory Crimes, § 951.

When our Territorial legislature came to deal with the subject in 1889, there were lotteries which were regarded as "legal" and also lotteries which were known as "illegal". See Williams, Flexible Participation Lotteries, § 15.

That there existed schemes which similated lotteries but were not inveighed against by our legislature is apparent from the first part of Sec. 6 of the Act. Laws 1889, c. 47. It is said that the provisions of the Act shall be construed to apply "only to such device or devices as are commonly called or known as 'lottery' ".

This was doubtless put in so that the act would not be construed to embrace other forms of gaming. Two years before the lottery statute was enacted, the legislature passed a law providing for the assessment and collection, "as in case of other license, a tax of one hundred dollars, per annum * * * on each gaming table and apparatus of any kind whatever, such as monte, faro, pass faro, pass monte, vandeau, roulette, twenty-one, red and black, rouge et noir,

poker, stud horse poker, or any other banking or percentage game of whatever name, or any game of chance played with cards, or dice, or any subterfuge for the same, by whatever name known." Laws 1887, c. 27, § 1.

The history of legislation shows that shortly prior to 1889 the last and most notorious authorized lottery in the United States was the Louisiana Lottery. That was known as a "plain lottery."

Mr. Williams in his work on Flexible Participation Lotteries, at § 202 discusses "plain lotteries" like the Louisiana lottery and the gift enterprise scheme which uses prizes by chance in promoting the sale of bonds, goods, service, entertainment or whatever the enterprise has to sell. Mr. Williams says that both types were prominent prior to 1889. He then says: "It seems that prior to 1889 all gift enterprise lotteries as well as all plain lotteries, were established on a closed participation basis, that is, the chances in the distribution of prizes were limited to paying patrons,—cash customers. * * * In a plain lottery he (participant) paid for a ticket or token in the drawing. In the gift enterprise he paid for goods, bonds, service, entertainment, or whatever the enterprise had to sell, and his chance was thrown in without extra charge."

Mr. Williams says at page 321 that the Royal Commission on Lotteries and Betting, 1932–33 Final Report thought that:

"A lottery (other than the Art Unions) is illegal whether it is conducted for a

charitable object, for the private benefit of the organizer, or simply for the benefit of the participants. * * *

"The need for clear thinking with respect to 'pious' lotteries is emphasized by the Royal Commission of 1932–33 in a paragraph reading as follows:

"Any proposal to institute lotteries in aid of good objects gives rise to a dangerous confusion of motives which is apt to conceal the real nature of the undertaking. The arguments against lotteries, from the social or economic point of view, apply with equal force, whatever the destination of the profits. If lotteries are undesirable as a means of raising revenue for the state, they do not become desirable when the proceeds are devoted to charity. The real motive behind the purchase of a lottery ticket is the desire to participate in a gamble, in the hope of personal gain. Yet many people who take tickets in a lottery promoted for the sake of charity find little difficulty in persuading themselves that their motive is unselfish. The confusion of motive which is inseparable from such a lottery is a most insidious method of encouraging and extending the gambling habit."

I am not in disagreement with the views of the Royal Commission but I make the point that we must view the territorial legislation of 1889, enacted nearly half a century before the Royal Commission made its report, in the light of the local conditions, other existing laws and the customs of the people in order to ascertain the intent of our legislature.

There appears in the Report and Opinions of the Attorney General of 1912–13, an opinion by Hon. Frank W. Clancy, then Attorney General, in which he says of the Act now before us for consideration:

"I have today received your letter of yesterday, in which you ask me whether the conduct of what is termed 'suit clubs' constitutes an offense against the statute prohibiting lotteries. As explained by you, twenty-five chances are sold and, when that number of chances have been sold, a drawing takes place, twenty-five numbers being put in a hat, the first one drawn winning the suit. I have no hesitation in saying that this constitutes a lottery within the meaning of the law, which you will find in Sections 1327 to 1332 of the Compiled Laws of 1897. It is undoubtedly true that this legislation was intended to suppress the sale of lottery tickets for such lotteries as that of Louisiana, which had become quite common throughout New Mexico, and which was considered demoralizing and detrimental to the public welfare; but in its terms it included everything which can be known as a lottery, with some exceptions stated in Section 1332, and the very statement of those exceptions shows that the legislature must have intended to stop all lotteries.

"There have been numerous attempts to define a lottery by the courts, but I have seen no definition which would not include such a scheme as the one you describe.

Perhaps the best definition is that it embraces all schemes for the distribution of prizes by chance, such as policy playing, gift exhibitions, prize concerts, raffles at fairs and other like methods.

"At the same time, bearing in mind the evil at which the legislation was aimed, it must be said that continuously, since the act was passed in 1889, there have been raffles, which are essentially lotteries, carried on in almost every town in the state without any interference from the authorities. Scarcely a week passes in any of our larger towns that there are not raffles of articles of property, for which chances are sold, and the winning party determined by lot. No attention has been paid to these infractions of the law, because public sentiment would not favor the enforcement of the statute against small schemes of this kind and, without the support of public sentiment, it is generally recognized that prosecutions under statutes of this class would be ineffectual."

I draw some support from the foregoing opinion, although some expressions in it may also support a contrary view.

In line with some of the thoughts expressed by Attorney General Clancy is what Mr. Williams says in his work on Lotteries at § 322:

"Luncheon Clubs and Church Dinners.— Here is a luncheon club with an average attendance of fifty or a hundred business men. After the luncheon, for which a charge of seventy-five cents or one dollar is made, there is a drawing for one, two or three prizes, ranging in value from fifty cents to two or three dollars. Participation is limited to the members present and their guests, practically a closed participation. The system is operated chiefly as an entertainment feature and usually winds up with a round of hilarity accompanied by an almost unanimous vote that the drawing is not straight. Is this luncheon club conducting a lottery? So far as the form is concerned, it is. The elements of prize, chance and consideration are all present. And in the event the prize is increased so that the value to be won induces members to attend and pay for the luncheon in order to participate in the drawing, the substance of a lottery is introduced. But this kind of prize drawing is seldom connected with the promotion of organized gambling, and unless the use of the drawing is prompted by the desire to make money and the spirit of the law is violated, a prosecution would not be advisable. Another line of demarcation may be drawn between the practice of giving nominal attendance prizes at church dinners and the practice of canvassing the public to sell lottery tickets to make money for the church or one of its organizations. The latter practice, which often engages children as ticket sellers, is subject to condemnation from several points of view. Most certainly the end does not justify this means.

"From the moral and religious point of view there is a sense in which the church lottery is more reprehensible than one of similar provisions which operates without any pious or charitable pretensions. Our

churches are the chief guardians of our morals. The welfare of youth is their solemn responsibility.

"But the enforcement of the moral code is not the immediate function of the prosecutor. His first duty is to protect the people from the powerful and well-organized rackets and gambling schemes. When these are driven out he may then with good grace proceed against those which are less detrimental to the general public.

"Next to the churches in responsibility stand the fraternal organizations who make proud boast of their devotion to brotherhood, good citizenship, obedience to law and right living. Of these the community has a right to expect a plane of life and devotion somewhat higher than common gambling with raffles and lotteries. But it can be said that a prosecutor who keeps down organized commercial gambling will have no trouble with the churches and fraternal bodies. Their innate sense of propriety will then respond to his demands that the law be respected. It is usually where the enforcement against commercial gambling is lax that the church or the lodge takes the greatest liberties with the law."

From these considerations in an effort to reach a conviction as to the intent of our legislature, I conclude that what was intended to be prohibited was not all forms of gaming, many of which were licensed in this territory, but it was the design "to protect the people from the powerful and well-organized rackets and gambling schemes" of the lottery type; and on the other hand

the legislature saw no detriment to the general public in a "sale or drawing of any prize at any fair held in this territory for the benefit of any church, public library, or religious society situate or being in this territory or for charitable purposes when all the proceeds of such fair shall be expended in this territory for the benefit of such church, public library, religious society or charitable purposes."

I am not in disagreement with the opinion expressed by Attorney General Clancy that the terms of the first five sections of the Act prohibited small schemes of the lottery type as well as big ones, but it is my view that when the legislature wrote Sec. 6 it intended to render immune from the provisions of the first five sections the small schemes of the type Mr. Clancy described and which he found to be so customarily indulged as to render their suppression impracticable.

I think it can be asserted with reason that the legislature did not intend to render immune from the first five sections of the Act the operation of a lottery of the Louisiana type and size if conducted for the benefit of a church, public library, or religious society, etc. That was not the type of lottery that was ordinarily conducted by or in the interest of churches, public libraries, or religious or charitable societies. The popular "small schemes" or raffles in which "articles of property" were disposed of by chance and which Mr. Clancy found so imbedded in custom and the irresistible impulse to play among the people to my mind

is what the legislature intended in Sec. 6 to indulge, if operated for the worthy objects mentioned in the statute.

Thus the elements of size, profit motive, and method of conduct come in for consideration.

Mr. Wharton in his work on Criminal Law, Vol. 2, p. 2075, paragraph 1778, indicates that there were two reasons for the suppression of lotteries: (1) Because of the dishonesty and deception in the conduct of the scheme itself; and (2) because they arouse the gambling spirit and lead the people to hazard their savings. It is not unlikely that the territorial legislature thought as Mr. Clancy observed that it would be difficult to maintain prosecutions for the suppression of participation in small schemes where "articles of property" were raffled and considered that small schemes of that sort, if conducted for the benefit of a church, public library or religious society and the proceeds went to worthy objects the profit motive in the operator would be absent and the method of conduct would be shorn of elements of unfairness and would furnish an outlet for the spirit of play found in the customs of the times, and in some degree at least render less difficult the enforcement of the provisions of the first five sections of the Act. At that time the laws of Wyoming, although vigorously prohibiting lotteries, provided: "But nothing in this section shall be construed as applying to games of chance known as raffles or other honest games, and the tickets of such games shall be sold only in this state." Rev.St.1931, § 32-815. Here was a differentiation between lotteries of the Louisiana type and raffles which although strictly speaking were lotteries, yet were clothed with features distinguishing them from lotteries of the more pernicious type.

In Massachusetts under certain restrictions and limitations as to purpose, prize, management and license, charity whist and beano are permitted in the State of Massachusetts. Williams, Flexible Participation Lotteries, p. 50. It is interesting to note that in Commonwealth v. O'Connell, Mass., 200 N.E. 269, 103 A.L.R. 872, in a case involving a prosecution for the violation of the Massachusetts Lottery statute providing that "nothing in this chapter shall authorize the prosecution, arrest or conviction of any person for conducting or promoting, or for allowing to be conducted or promoted, a game of cards commonly called whist or bridge or the game commonly called beano, or substantially the same game under another name, in connection with which prizes are offered to be won by chance; provided that the proceeds of the charges for admission to, and/or participation in such game are donated solely to charitable, civic, educational, fraternal or religious purposes, * * * " it was assumed by attorneys for the Commonwealth and the court that even though one-third of the *receipts* "the gross amount subscribed less solicitation expense" was to be distributed in 250 cash prizes, this did not negative the idea that the proceeds of the game were being

donated solely to the worthy objects mentioned.

In Montana the Constitution of 1889, Art. 19, Sec. 2, provides that the legislative assembly shall have no power to authorize lotteries or gift enterprises for any purpose and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in that state. The legislature enacted a law providing that every person who contrives, prepares, sets up, proposes or draws any lottery is guilty of a misdemeanor. The legislature also provided that the Act should not apply to the giving away of cash or merchandise attendance prizes, premiums by public drawings at agricultural fairs or rodeo associations in the state, and the county fair commissioner of agricultural fairs or rodeo associations in the state may give away at such fairs cash or merchandise attendance prizes, or premiums by public drawings.

In Rhode Island there exists a drastic law prohibiting public or private lotteries, but it is also provided that any religious, charitable, fraternal, civic, educational or veterans organization may promote, carry on or conduct under the direction of its own members, serving without any compensation, the game commonly called "beano" or "bingo" or substantially the same game under any other name in connection with which prizes are offered or awarded, provided that the prize shall not exceed $100 in value; that no cash shall be offered as a prize or used to redeem a prize, and the entire proceeds for admission and participation, less certain necessary expenses, must be applied to the purposes of the organization, and that such game shall not be carried on oftener than once a week, except at fairs, carnivals, bazaars or similar activities, and any game thus carried on must first be authorized and licensed by the proper town or city officials.

We see in the Rhode Island statute a differentiation as to size and also as to the nature of the prize eliminating money or cash as prizes and also a recognition that there will be some necessary expenses attached to the enterprise such as holding a game of "bingo" or "beano" or the conduct of a fair, carnival or bazaar.

So we see the question of "bigness" and the nature of the prize and the absence of the profit motive entering into the legislative consideration. It is said by the law writers that usually the gist of the offense is the adverse effect on the public and not in the wrongful intent of the promotor, and hence in the absence of legislation conferring some special immunity, the purpose of the scheme is immaterial. See 45 Harvard Law Review, page 1199. Our legislature provided special immunity in some instances based on motive and partially on nature of prize, size of scheme and object of its operation. I think those considerations stated more specifically in statutes of other jurisdictions may be found by construction in our own when properly considered.

I am disposed to agree with the Attorney General and the learned trial judge that a

scheme of the magnitude proposed by appellant is not within the exception. According to the public press the trial judge, when rendering his decision, said that our legislature never contemplated even in its wildest dreams a lottery of the scale proposed by the Harriman group when excepting lotteries for the benefit of churches, public libraries and charitable purposes.

The Attorney General, arguing on behalf of appellee, says: "Appellant's syllogism is thus: The Legislature denounced lotteries and provided an exception in the case of a charity; that once the charity is present, the sky is the limit; and there is no restriction upon the size of the lottery, size of the prize, or the notoriety of and wide-spread participation therein. In construing a legislative act which is ambiguous, the courts may consider the history of the times and the evil sought to be remedied and construe the statute in keeping therewith. 59 C.J. 1014, Sec. 603. Such being the case, it seems to us inconceivable that the Legislature in banning lotteries because of reasons above set out at the same time intended to permit a loophole which would permit a huge lottery provided merely that the net proceeds after deducting large commissions and diverting large amounts for prizes be devoted to charitable purposes. If such was the intention of the Legislature, it could have so provided in plain words. To our minds, the manifest intention of the Legislature when considered in view of the time at which Chapter 47, Laws of 1889, was passed was to prevent the application of the penal provisions of the act to small church fairs and socials. We think that the statute, when construed in the light of reason and common-sense, admits of no other interpretation. Otherwise the Legislature in passing Chapter 47, Laws of 1889, merely went through idle motions. It was to protect participants in such functions that Section 35-3808 was appended to the act, and not to provide an expedient permitting wholesale public participation in lotteries."

Without in the least questioning the laudability of the purposes and motives of those involved in the present proposal or questioning that the scheme would be fairly conducted, its characteristics similate those of the powerful well-organized commercial gambling schemes to suppress which is thought to be the paramount purpose of the act under review.

Attorney General Clancy was twenty-five years nearer the legislative declaration than we are and a resident of the territory for more than a decade before the law was enacted. He was an able lawyer and a citizen keenly interested in public affairs and the administration of the laws. He was realistic enough to see that while the people and their representatives in the legislature were supposed to and desired to suppress the big, powerful, well-organized gambling schemes of a commercial character conducted for the profit of the operators which were like the Louisiana Lottery, the people would not generally observe a law which sought to suppress "small schemes" of another kind, namely,

"raffles of articles of property". It is perhaps not complimentary to the citizenry that they decline sometimes to observe laws which are not popular, yet it is one of the facts commonly noted. I think it was the kind of play for prizes consisting of "articles of property" which the people indulged even in the teeth of the law that the legislature made immune from the provisions of the first five sections of the Act provided the profit motive to the operator was absent and that the proceeds of the fair at which the drawing was held should go to worthy objects. Undoubtedly the word "prize" as ordinarily used is broad enough to include money. But in view of the context of the opinions of the Attorney Generals, past and present, and drawing upon my own observations of the conduct of church and lodge fairs, carnivals, bazaars and similar activities over many years in New Mexico, that invariably the prizes offered for "sale or drawing" have been "articles of property" other than money, I am disposed to the view that the prizes mentioned in the exception were not cash prizes. Some support to this view comes from the language of the exception itself: "shall not be construed to apply to any sale or drawing of any prize." We do not think usually of the "sale" of money, whereas this is an appropriate word used in connection with the disposal of articles of merchandise.

I find myself able to agree with much that Brother SADLER has said, but unable to accept his view that "all the proceeds of such fair" means that the hall or grounds where the fair is held must be donated, that the services of materialmen, artisans and laborers must all be donated and that no item of legitimate expense, however small, incident to conducting the fair could be deducted from the "receipts" of the fair. Even the Attorney General finds himself unable to go all the way with Brother SADLER on that route.

Since it is my view that the legislative intent to render immune from the first five sections some "small schemes" as a means of raising money for worthy objects, Brother SADLER'S rather strict construction seems to me in practical operation to prohibit that which is permitted.

It is an unusual statute beset with difficulties of construction. Brother SADLER reaches his conclusion from the premise that the statute is not ambiguous. I am in agreement with the Attorney General in his statement heretofore quoted that the act is ambiguous. Brother SADLER'S view, as I understand it, is that Sec. 6 would render immune from prosecution, arrest or conviction for commission of any of the acts described in the first five sections of the act in connection with the operation of a lottery of the Louisiana or Irish Sweepstakes sort if such lottery were conducted at a fair held in this state for the benefit of any church, public library, etc. If I could accept that view I would have little difficulty in going along with the remainder of his argument. Here is where our divergence of view first arises. In the first place, it would have been so easy

for the draftsmen of the bill said to have been prepared by a Committee of the Bar Association and presented by the late Thomas B. Catron to have said just that. In order to have done what Brother SADLER says was done it would have been necessary for our legislature to run counter to the policy of the Federal Government whose crusade then prominent and vigorous against the Louisiana Lottery and others of the same sort which did not recognize any exceptions or immunity arising out of good motive and worthy and charitable objects of the promoters of the schemes. Such an antagonism of purpose is not to be presumed. When our statute was enacted our territorial legislation was subject to the supervisory power of Congress over it, and the fact that Congress expressed no disapproval and that the enactment stood for over twenty years prior to statehood, and that no demand was made in the Enabling Act for its nullification, is strong evidence that Congress did not place the construction on it advocated by Brother SADLER.

Starting with the proposition that our legislature intended to suppress an evil and at the same time to sanction the things prohibited if they were done for a worthy object in the manner mentioned in Sec. 6, Brother SADLER, seeks to save the face of the legislature from the inconceivable position he puts them in by diluting the sanction as much as possible by showing that "all the proceeds of the fair" to worthy objects means a thing so difficult of ac-

complishment that after all it is really a prohibitory statute. But if it were aimed to prohibit this could have been accomplished easier by leaving off Sec. 6. I approach the matter differently.

The paramount evil at which the legislation was aimed, to-wit, suppression of such lotteries as that of Louisiana, finds no immunity in Sec. 6. In Sec. 6 the legislature turns its attention to what Attorney General Clancy describes as "small schemes" known as "raffles of articles of property" which "are essentially lotteries" but not the kind attended with the features prohibited in the first five sections. It was a waste of time and effort to write in Sec. 6 a description of a "device or devices" to which it was said "the provisions of this act * * * shall not be construed to apply" if they were the same kind of "device or devices" which were described in the first five sections.

The first important meaning of Sec. 6 is that a "sale or drawing of any prize at any fair held in this territory for the benefit of any church," etc., is a different scheme or device than that sought to be suppressed by the first five sections. A raffle is a method disposing of an article—Standard Dictionary. Ballentine's Law Dictionary defines the word thus: "A game of chance in which the owner fixes the value of the article set up to be raffled; this value is then equally apportioned among the adventurers, who, by throwing dice, coins or other hazard, determine which adventurer is the winner of the article."

A raffle is thus defined in Century Dictionary: "A method of sale by chance or lottery, in which the price of the thing to be disposed of is divided into equal shares, and the persons taking the shares cast lots for its possession by throwing dice or otherwise."

It is probably what the legislature meant by "sale" in Sec. 6. I do not doubt that an ordinary raffle is essentially a lottery, the holding of which may be contrary to the provisions of Sec. 1 of the act, but it is another thing to say that a "sale [raffle] or drawing of any prize at any fair held in this territory for the benefit of any church, public library, or religious society", section 6, is what was *commonly called or known as 'lottery'*", which they said was the sole object of these prohibitions. My point is that before we get to the requirement as to the disposition of the proceeds of the fair we run into features of differentiation between what is sanctioned in Sec. 6 and what is prohibited in the first five sections. The legislature did not sanction a lottery commonly so called and known, or even a "sale or drawing of any prize" because the proceeds thereof were expended for the benefit of a church, public library or religious society—it is only where the sale or drawing of a prize is conducted at a fair held for the benefit of a church, etc., that it is differentiated from lottery commonly so called and known. This suggests that the fair must be regarded as the paramount thing and the drawing an incident merely. The legislature would doubtless have been as much surprised to see a Louisiana Lottery or Irish Sweepstakes at a church fair as to see the tail wagging the dog. The statute should be construed so as to accomplish the aim of the legislature—to prohibit what was prohibited and to sustain what was sanctioned. "All" does not change the meaning of "proceeds" into "gross receipts." It means that the "proceeds of the fair" shall be expended solely in this state, and solely for the benefit of the worthy objects mentioned.

The Attorney General in his brief further says: "In concluding, we wish to direct the court's attention to the fact that the present plan will necessarily violate Federal statutes. These forbid either the interstate transportation of any lottery ticket or advertisement (18 U.S.C.A. § 387) or the use of the mails for any lottery purpose (18 U.S.C.A. § 336). If one million dollars are to be realized in a year from the present plan it will mean that approximately four million tickets will have to be sold. Facts lying within the field of judicial notice demonstrate that no such a sale of tickets is possible in New Mexico. This ground of illegality has not been assigned by demurrer but should be taken into consideration before a state institution is to be declared bound by a contract to participate in and sanction such a plan."

I take the foregoing into consideration in construing the statute. At the time of its enactment Congress exercised a supervisory power over our territorial legislation. There had been legislation of the Congress to suppress lotteries of the Louisi-

ana type, similar to that mentioned by the Attorney General last quoted. It is not to be supposed that our legislature was running counter to the policy of the Federal Government. The first five sections of the act are fully in accord with that Federal policy. It has been said that a state statute ought not to be construed, unless absolutely demanded, so as to hamper the Federal Government in the enforcement of its public policy. See 25 R.C.L., Statutes, sec. 262. There should be good faith between the states and the United States. 25 R.C.L., Statutes, sec. 264.

The author of the article in Harvard Law Review quoted supra says: "The word 'lottery' calls to mind an organized gambling scheme, such as the Irish Sweepstakes" and in earlier days the word called to mind organized gambling schemes such as the Louisiana Lottery. The argument is advanced in support of the scheme before us that as the passion for play is irrepressible among the people, and as their money would be otherwise invested in foreign lotteries such as the Irish Sweepstakes, it is better to have the conduct of similar lotteries at home; that under appropriate supervision the evils attendant upon them would be diminished and so forth. It is a matter of common knowledge that efforts are made to evade the Federal laws heretofore mentioned with respect to selling chances in the Irish Sweepstakes and it is to be supposed that similar attempts would be made where the success of a similar lottery on a gigantic scale is dependent upon the sale of a very large number of tickets. It is recalled that the Wyoming Statute cited supra which sanctioned "raffles and other honest games" provided that "the tickets of such games shall be sold only in this state". It is true that the contract and other papers in the case at bar pledge the agents who are intrusted with the sale of tickets entitling the purchasers to participate in the lottery to not violate any Federal statutes and it is alleged that all of the tickets will be sold in New Mexico. Whether that is true or not in the present case I am convinced that the legislature in enacting our statute did not contemplate by the immunity provision contained in Sec. 6 that a lottery of the magnitude proposed ordinarily depending for its success on the sale of tickets all over the country, and thus contrary to the policy of the Federal Government, would nevertheless be lawful if all the proceeds of the fair at which the lottery was conducted shall be expended in this state for the worthy objects mentioned. This consideration of deference to and comity toward the Federal Government and its policy sought to be enforced by the denial of use of the mails for the transportation of tickets and forbidding the interstate transportation of lottery tickets would not be impinged by the conduct of "small schemes" in the nature of "raffles of articles of property". So I conclude that the rules of statutory construction warrant me in finding a differentiation between the schemes themselves as described in the first five sections and in the sixth section. A construction which would violate the spirit

and purpose of the Federal policy should be avoided if possible.

Keeping before me the rule of statutory construction—that the reasonable meaning must be presumed to be the true meaning—I find the scheme proposed in the case at bar to be under the ban of the statute, but I am unable to subscribe to Brother SADLER'S interpretation of the meaning of the phrase "all the proceeds of such fair" and therefore, for the reasons stated, I concur in the result.

HUDSPETH, Chief Justice.

I concur in the views expressed and the conclusion reached by Mr. Justice BICKLEY.