ESTEBAN SERRA ET AL., Plaintiffs and Appellees, *v.* SALESIAN SOCIETY ET AL., Defendants and Appellants.

No. 12454.   Decided December 29, 1961.

*Edelmiro Soldevila* for appellants. *Gilberto Ramírez Velasco* and *Guillermo Bauzá* for appellees.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

In this action the courts are urged to use the State's coercive machinery to enforce an illegal contract.

A close examination of the facts of the case is warranted; then we shall consider the applicable law. In June 1954, Rev. Juan Riu, Father Superior of Oratorio San Juan Bosco, a Catholic Church institution situated in Santurce, P. R., mailed to Elisa Pérez Serra, the plaintiff herein, to her residence in Guánica, P. R., a mimeographed circular dated June 1 of that year together with a coupon book containing ten one-dollar tickets for a raffle to be drawn, as recited in that circular, on July 4, 1954. The said circular, which is signed by Father Riu, explains that the priests were collecting funds for religious purposes of the Oratorio and adds, "To that end, we count on the success of a raffle which . . . we propose to draw on July 4."

The raffle prizes would be a "diamond ring valued at $8,000," a "hand-painted picture," a radio, and a silver rosary. Those prizes would correspond, in their order, to the holders of the tickets with "the numbers corresponding to the first, second, third, and fourth prizes of the special drawing of the Lottery of Puerto Rico to be held on July 4, 1954," as stated in the tickets.

The plaintiff decided to buy the tickets, but she had to wait till the end of the month for her husband to receive his check in order to be able to remit the $10, which is the amount of the tickets, to Father Riu in San Juan. Her husband received the check, it was cashed, and on July 2 the plaintiff went to Yauco in order to send the money to San Juan with a person whom she knew quite well. This person was William Oliveras, co-owner of a public-service car which covered daily the Yauco-San Juan route. Oliveras put away the money in his desk in order to take it the next day, July 3, to San Juan to Father Riu. On that date a relative of Oliveras, who was very ill in Ponce, died and for that reason Oliveras forgot Mrs. Serra's errand. The money remained in his desk in Yauco.

The lottery was drawn on July 4. Mrs. Serra learned that her ticket was the winner of the $8,000 diamond, but she also learned that Oliveras had forgotten to take the money to the Father. In order to prove to the Father that she had given the money to Oliveras on July 2, before drawing the raffle and not after, Elisa Serra went to the Oratorio in Santurce in the company of Oliveras. They explained the situation to Father Riu and delivered $10 to him in payment of the tickets, which the Father accepted. On that occasion the Father told the plaintiff that he would deliver the diamond to her, but that he did not have it with him and that it was in a bank in San Juan; that he would deliver it to her two days later. The plaintiff stayed in San Juan and two days later she called up the priest in order to pick up the diamond. The Father then told her that he would not deliver it to her because the matter was in the hands of a lawyer and of a committee. That same week the Father sent the lawyer and two other persons to call on the plaintiff for the purpose of returning the $10 and informing her that the prize would not be delivered to her. The plaintiff refused to accept the money.

The plaintiff testified that although she was reluctant to "go that far," but "since the Father told me that he had a lawyer," she also hired a lawyer. The plaintiff and her lawyer went to see the Father again. At that interview the Father asked for "evidence" that she was the winner. The plaintiff complied and brought from Yauco, to see the Father, the four persons who were present in Oliveras' office in Yauco on July 2 when she delivered the money to Oliveras in order that he would bring it to the Father. Those persons were William Oliveras himself, his secretary Pablo Mercado, and two ladies who were regular passengers in Oliveras' cars (Ana Pérez and Adelina Santiago). Again they explained the situation to the priest and informed him that those four witnesses had given sworn statements to that end. The plaintiff also handed to Father Riu a letter of introduction of the priest of Arecibo, who had performed the marriage between her and her husband 18 years ago. She brought other letters of introduction and "the edition of the newspaper" to which we shall refer shortly. Despite the witnesses and the letters, the Father ratified his decision not to deliver the prize.

The lottery was drawn, as has been said, on July 4. The following also appears from the evidence. The plaintiff and Oliveras delivered the amount of the tickets to Father Riu on July 7 or 8. Under date of July 14, Father Riu sent to the purchasers of the raffle tickets a mimeographed circular, signed by him, informing the winners of the prizes. According to that letter, the plaintiff, Elisa Pérez Serra, of Guánica, was the winner of the first prize. The letter also informs that two other persons "were also presented with television sets": Demetria Rodríguez and Dr. Manuel García Estrada. In the July 17 edition of "El Mundo" newspaper of San Juan there was published a notice of Oratorio San Juan Bosco informing the winners of the July 4 "activity," in which Elisa Pérez Serra, of Guánica, is declared

to be the first winner.   Also mentioned, among other winners, is Dr. Manuel García Estrada.

Dr. Manuel García Estrada testified at the trial as one of the witnesses for the defendants.   His participation in the acts consisted in that he was one of the members of the committee who called on the plaintiff, at Father Riu's request, for the purposes of returning the $10.   After testifying, the attorney for the plaintiff asked Dr. García Estrada on cross-examination whether he had received the television set which he had won, according to Father Riu's circular of July 14. The doctor's answer was this: "That's the first news about the television set.   I have not received the television set nor the notice from Father Riu, nor anything."

Finally, in view of the failure of all her persuasive attempts the plaintiff brought a civil action in the superior court praying that the defendants be ordered to deliver to her the diamond ring valued at $8,000, or the equivalent in cash, plus costs and attorney's fees.   The complaint having been sustained by the trial court, the defendants, Father Riu and Salesian Society, appealed to this Court charging the trial court with the commission of six errors.  We copy below verbatim the first error: "The trial court committed gross and fundamental error in denying the motion to dismiss, the motion for summary judgment, and the special defense alleged in the answer, on the ground that the court lacks jurisdiction to take cognizance of this case, inasmuch as it is expressly forbidden by law by reason of the subject matter and that, for the same reason, the complaint does not state facts constituting a cause of action."

In other words, the issue before this Court is, can the courts give plaintiff the remedy sought by her?  Would that be compatible with our duty to uphold the laws?  Is it possible in view of the existing specific law?  Let us consider the nature of the contract between the parties and the existing situation of law.

316

■ Raffles, lotteries, and other games of chance are prohibited by law. Only some are permitted by way of exception, and in these cases the Legislative Assembly has had reasons of public policy to do so. Section 291 of our Penal Code provides that:

"A lottery is any scheme for the disposal or distribution of money or property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or interest in such money or property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, *whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known.*" 33 L.P.R.A. § 1211. (Italics ours.)

In the following section (§ 292) the Code provides that "Every person who contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor." Regarding the sale of lottery tickets, the Penal Code provides that:

"Every person who sells, gives, or in any manner whatever furnishes or transfers to or for any other person any ticket, chance, share, or interest, or any paper, certificate, or instrument purporting or understood to be or to represent any ticket, chance, share or interest in, or depending upon the event of any lottery, is guilty of a misdemeanor." Section 293, 33 L.P.R.A. § 1213.

Every person who aids in setting up, managing, or drawing a lottery shall also be guilty of a misdemeanor (§ 294), and the moneys and property offered for distribution in violation of the said provisions shall be forfeited. Section 297, 33 L.P.R.A. § § 1214 and 1217.

■■ There is no question that the raffle object of this case comes within the provisions of § 291 *supra* of the Penal Code, which defines the "lottery" prohibited by that Code in the following § § 292 to 298. The raffle under consideration comprises a "scheme for the disposal or distribution" of

"property by chance, among persons who have paid or promised to pay" a consideration "for the chance of obtaining such property or a portion of it," upon "any agreement or expectation that it is to be distributed by lot or chance." In addition to the fact that such raffle comes within the provisions of the Code which prohibit the same, the three elements traditionally considered by the authorities as essential to a lottery or game of chance prohibited by the statutes are present therein. These three elements are (1) the prize, (2) the chance of winning the prize, and (3) the "consideration" paid or promised to be paid in order to be entitled to participate in the raffle or lottery. In the case at bar, those three essential elements are clearly present, which stated in the same order are (1) the diamond ring, (2) the chance of holding or not the ticket with the number corresponding to the first prize of the lottery of Puerto Rico, and (3) the dollar paid for each raffle ticket. *People* v. *Swiggett*, 37 P.R.R. 845, 849 (1928).

See to the same effect the following cases construing § 319 of the Penal Code of California, counterpart of § 291 of our Code and from which ours was taken. *People* v. *Postma*, 160 P.2d 221 (1945); *People* v. *González*, 144 P.2d 605 (1944); *People* v. *Babdaty*, 30 P.2d 634 (1934); *People* v. *Cardas*, 28 P.2d 99 (1934); *People* v. *Hecht*, 3 P.2d 399 (1931).

The matter is sweepingly settled by the authorities. *F.C.C.* v. *American Broadcasting Co.*, 347 U.S. 284, 98 L. Ed. 699, 706 (Chief Justice Warren, 1954); *Homer* v. *United States*, 147 U.S. 449, 37 L. Ed. 237, 241 (1893); *Affiliated Enterprises* v. *Truber*, 86 F.2d 958, 959 (1959); *J. C. Martin Corp.* v. *F. T. C.*, 242 F.2d 530, 533 (1957); *United States* v. *83 Cases of Merchandise*, 29 F. Supp. 912, 914 (1939); *Affiliated Enterprises* v. *Rock-Ola Mfg. Corp.*, 23 F. Supp. 3, 5–7 (1937); *Central States Theater Corp.* v. *Patz*, 11 F. Supp. 566, 568 (1935); *State* v. *Jones*, 107 P.2d 324, 326

(1940) ; *Iowa* v. *Hundling*, 264 N.W. 608, 609 (1936) ; Annotations in 96 L. Ed. 312, 313–14; 113 A.L.R. 1121; 109 A.L.R. 709; 103 A.L.R. 866; 60 A.L.R. 349; 57 A.L.R. 424; and 48 A.L.R. 1116.[1]

If the three elements (prize, chance, and consideration) are present in any activity and they jointly constitute the game prohibited by law, such activity comes within the statutory prohibition regardless of the *name* given or attributed to such activity (lottery, raffle, gift, etc.). *Holmes* v. *Saunders*, 250 P.2d 269, 270 (1952) ; *Grimes* v. *State*, 178 So. 69 (1937), *cert. denied*, 178 So. 73; *State* v. *Wong Took*, 265 Pac. 459 (1928) ; *State* v. *Danz*, 250 Pac. 37 (1926). And if the activity violates the law, it does not become legal because its real or alleged *reasons* are or appear to be worthy, whether charitable, religious, or for commercial promotion, etc. *Fairchild* v. *Schanke*, 113 N.E.2d 159, 163 (1953) ; *Commonwealth* v. *Malco-Memphis Theatres*, 169 S.W.2d 596 (1943) ; *People* v. *Kiefer*, 16 N.Y.S.2d 858 (1940) ; *State ex rel. Trampe* v. *Multerer*, 289 N.W. 600 (1940) ; *Harriman Institute* v. *Carrie*, 84 P.2d 1088 (1938). Nor is it necessary that an advantage or profit be received. *People* v. *Martínez*, 23 P.R.R. 212, 214 (1915). Nor is it relevant that the prohibited "lottery" be drawn in connection with that of Puerto Rico or of any other country. *People* v. *Sierra*, 49 P.R.R. 496, 499 (1936).

It appearing from the foregoing analysis that the raffle or lottery in this case is prohibited by law, let us determine the position at law of the litigants.

Our Civil Code contains certain preliminary provisions which, because they are taken for granted, are afterwards

---

[1] We need not cite more authorities on this point. In 54 C.J.S. *Lotteries* § 2, footnote 14, there are citations of numerous authorities holding the same view as that stated above, from Ala., Ariz., Cal., Conn., Del., D.C., Fla., Ga., Iowa, Mass., Mich., Minn., Miss., Mo., Mont., Neb., N.H., N.Y., Okla., Ore., Pa., R.I., S.C., Tenn., Tex., Wash., W.Va., and Wis.

forgotten. By way of introduction to the statements to be made further on, it is well to state those principles which are pertinent to this case: Ignorance of the law does not excuse from compliance therewith; acts executed contrary to the provisions of law are void; laws shall only be repealed by means of subsequent laws, and disuse, custom, or practice to the contrary shall not impede their enforcement; when there is no statute applicable, the court shall decide in accordance with equity; civil laws are equally applied to all... Sections 2, 4, 5, 7, and 22 of the Civil Code; 31 L.P.R.A. §§ 2, 4, 5, 7, and 22, respectively.

With that background in view, and in the light of the provisions of the Penal Code above discussed, let us examine the specific provisions of the Civil Code applicable in the decision of this case.

Section 1698 of our Civil Code provides in its pertinent part that "The law does not permit any action to claim what is won in a game of chance, luck, or hazard." 31 L.P.R.A. § 4771. This provision refers to prohibited games. The Code clarifies in its § 1701 that "A person who loses in a game or a bet which is not prohibited is civilly liable." The public policy contained in § 1698 *supra* is so strong that even in this excepted case of § 1701, this § 1701 adds that "the judicial authority may either not admit the claim when the sum which was wagered in the game or bet is excessive, or may reduce the obligation to the amount it may exceed the customs of a good father of a family." 31 L.P.R.A. § 4774.

The sections of the chapter of our Civil Code dealing with games of chance and bets are identical with those of the Spanish Civil Code from which they were taken. Commenting on these sections, Puig Peña says that, in general, the legislations have adopted an eclectic temperament, permitting and even encouraging the games which contribute to the exercise of the body, and prohibiting the games of chance or

sheer luck.[2]  Discussing a situation similar to that at bar, the same author says:

"If a bettor, in a prohibited game, loses and does not pay, his conscience may reproach him, or perhaps the social circle in which he lives; but he knows that in the juridical plane he is free from claim.  Section 1798 expressly provides that the law does not permit any action to claim what is won by chance, luck, or hazard.  The nonperformance is therefore devoid of a juridical relief to restore the disturbed 'order.'  But the fact is that there is a poor cause of action for both parties, and also of a penal character, as already stated, and when the nullity of an obligation arises from the illicit cause or object of the contract, if the fact constitutes an offense or misdemeanor common to both contracting parties, they shall have no cause of action against each other."  Puig Peña, *op. cit.* at 475.

Puig Brutau expresses it laconically: "the juridical order does not intervene to compel payment of a debt on account of game..."[3]  Sánchez Román points out that the civil law is concordant with the penal law, which prohibits games of chance or luck, by not permitting any action to claim what is won in a game of this type.[4]  Castán reiterates the concept contained in the Spanish § 1798 (which is the counterpart of the Puerto Rican § 1698) in the sense that the law does not permit any action to claim what is won in a game of chance, and adds that since the prohibited game is an antijuridical institution, it is absurd to consider it even as a source of natural obligations.[5]

█ Manresa writes: "The games of chance, luck or hazard being prohibited by law, it is evident that the law could not authorize them to permit any action to claim successfully what was won in a game of such a type, and that is

---

[2] 4–2 Federico Puig Peña, *Tratado de Derecho Civil Español* 470 (Madrid, 1951).

[3] 2–2 José Puig Brutau, *Fundamentos de Derecho Civil* 520 (Barcelona, 1956).

[4] 4 Felipe Sánchez Román, *Estudios de Derecho Civil* 824 (2d ed.).

[5] 4 José Castán Tobeñas, *Derecho Civil Español, Común y Foral* 680 (8th ed. 1956).

why it could not fail to set forth in the Code the precept contained in the first part of § 1798, for the reverse would have been to incur an undeniable contradiction."[6]  The said author concludes that "the act being void as being contrary to the law which prohibits such games and bets, it can not produce obligation nor any juridical effect." [7]  He points out that the legislations of the civilized countries are almost universally agreed, and in their concordance he mentions the European and Spanish-American codes which on this point contain precepts equal or similar to those of our Code.  Manresa, *op. cit.* at 56–60.

Scaevola shares the view of Laurent expressed in his commentaries on the French Civil Code, and of Giorgi in the latter's reference to the Italian Code, and states that in these cases the claim should be rejected *a limine*, outright, when the game is clearly unlawful, for, he says, "we should not expose the courts of justice as toys or entertainment of claims which are clearly illicit, not even to claim their consent, because the courts could not recognize it: the question is one of *public policy*." [8]

In addition to § 1698 *supra*, there are other sections of the Civil Code which are also crystal-clear in this connection. Section 1207 provides that "The contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, *provided they are not in contravention of law, morals, or public order*."  31 L.P.R.A. § 3372.  (Italics ours.)  Section 1227: "Contracts without consideration *or with an illicit one* have no effect whatsoever. A consideration is illicit *when it is contrary to law and good morals*."  31 L.P.R.A. § 3432.  (Italics ours.)  And § 1257, in its pertinent part: "When the nullity arises from the illegality of the consideration or the object of the contract, if

---

[6] 12 José Ma. Manresa y Navarro, *Comentarios al Código Civil Español* 44 (5th ed. 1951).

[7] Manresa, *op. cit.* at 53.

[8] 28 Scaevola, *Código Civil* 154 (Madrid, 1953).

the fact constitutes a *crime or misdemeanor common to both contracting parties, they shall have no action against each other* and proceedings shall be instituted against them, and, furthermore, the things or sum which may have been the object of the contract shall be applied as prescribed in the Penal Code with regard to the goods or instruments of the crime or misdemeanor." 31 L.P.R.A. § 3516. (Italics ours.)

In *People* v. *Medina*, 19 P.R.R. 676 (1913), this Court said at p. 677, speaking through the then Associate Justice Mr. Del Toro: "It is true that playing lotteries is prohibited by law in Porto Rico and that the law does not permit any action to claim what is won in a game of chance, luck, or hazard...also, the rule is well settled that in lottery transactions, as in all unlawful contracts generally, the courts will leave the parties where it found them and will not lend its aid either to enforce or rescind the contract ... as the judiciary power is not invoked to aid an individual in securing the proceeds of an unlawful transaction ..." (Citations omitted.) In the same sense as in the *Medina* case, *supra*, and also in connection with lotteries prohibited by the California statute which, as we have said, is the counterpart of ours, see *People* v. *Lain*, 134 P.2d 284 (1943) ; *People* v. *Rosen*, 78 P.2d 727 (1938) ; 116 A.L.R. 991; and *Holmes* v. *Saunders, supra.*

Although a person who by the acceptance of benefits under a contract may be estopped from questioning the existence, validity, and effect of such contract, a well-recognized exception to the rule is that where the contract is void as against public policy, a person who has accepted a benefit thereunder will not be estopped to defend against the contract when it is sought to be enforced against him. *Pagán* v. *Heirs of Padilla*, 42 P.R.R. 941, 947 (1931) ; *Sánchez* v. *Coll*, 69 P.R.R. 863, 865, 867 (1949).

In mailing the raffle tickets and the circular offering the tickets, it is likely that a federal offense was committed and

that a legal provision punishing the mailing of letters, circulars, and publications concerning any lottery or similar scheme offering prizes dependent upon lot or chance was violated. 62 Stat. 762, ch. 645, June 25, 1948; 18 U.S.C.A. § 1302; annotation in 96 L. Ed. 312: *"Offenses against the mails: what is a lottery or similar scheme"*; 72 C.J.S. *Post Office* § 53. We have nothing to decide in this connection.

In view of the fact that the contract involved in this action which we are urged to enforce is illegal and that our civil law, through several explicit and clear provisions, provides that under those circumstances the law does not permit any action, or, as stated by Puig Brutau, the juridical order does not intervene, we hold that the first error assigned was committed and that the judgment appealed from must be reversed. The litigants' conduct is prohibited by law and we can not aid them in perfecting their violation. Furthermore, it would be specious if the law on the one hand would declare an act a public offense and the courts on the other hand compel its enforcement. This decision may seem prima facie harsh and legalistic, but it is not because it is not based on inconsistent subtleties of law, but on our inescapable duty to uphold the laws and enforce a premise which goes into the very marrow of the legal system in which we live—that which provides that the civil laws are equaly applied to all. As respects the plaintiff, let us recall that since there is an applicable law we can not resort to equity, and furthermore, that since the question is one of public policy, there is also an equity which we owe to the community in general. The equity of one can not be based on the denial of justice to the others.

We need not discuss the other errors assigned. The judgment rendered by the Superior Court, San Juan Part, on May 6, 1957, will be reversed.